# BOARD OF SUPERVISORS OF LIVINGSTON COUNTY

*v.*

# AARON WEIDER.

64  427
136  408
64  427
66a  113
64  427
177  198

64  427
207  1504

1. TAXES—*for what purposes may be levied by municipal corporations.* Section 5 of Article 9 of the constitution of 1848 provides that the corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same: *Held,* that, within the meaning of this provision of the constitution, a tax for corporate purposes must be for such purposes and such only as are germane to the objects of the creation of the municipality, at least such as have a legitimate connection with those objects and a manifest relation thereto.

2. To provide a location or site for a State institution is not such a corporate purpose as would authorize the authorities of such municipalities to impose upon property owners an onerous tax to pay the expense.

3. The action of the board of supervisors of Livingston county in authorizing the issue of the bonds of the county for the purpose of securing the location of the State Reform School in the township of Pontiac, in that county, in accordance with the act of 1869, providing for aid from municipal corporations in the erection of that institution, was illegal and void, the legislature having no power, under the constitution, to authorize such corporations to levy a tax for such purposes.

4. And, no matter in whose hands such bonds may be, where a tax has been levied and collected for their payment or for the payment of the accruing interest thereon, the county treasurer may be restrained from applying the money so collected to such purpose. Such money is the property of the tax-payers, and justice requires it should be refunded to them.

APPEAL from the Circuit Court of Livingston county; the Hon. CHARLES H. WOOD, Judge, presiding.

Messrs. INGERSOLL & McCUNE, and Mr. C. BEATTIE, for the appellant.

Mr. L. E. PAYSON, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery, in the Livingston circuit court, filed by the board of supervisors of that county, to which the county treasurer was made defendant, praying to enjoin him from paying certain moneys in his hands on bonds alleged to have been fraudulently and illegally issued to aid in the erection of the State Reform School, in the township of Pontiac, in that county.

The county treasurer put in his answer, admitting he had five thousand dollars in his hands collected of the tax-payers of the county to pay the annual interest on one hundred bonds of five hundred dollars each, bearing interest at the rate of ten per cent per annum, with coupons attached thereto, which the county of Livingston had issued and sold, and were now in the hands of certain non-resident parties; that the bonds were issued on the 15th of July, 1869, and the amount in his hands was to be applied to the interest then due upon them. He denied all fraud and combination, and alleged that the interest for one year had been paid on these bonds by order of the board of supervisors.

On the hearing, the court dissolved the injunction and dismissed the bill.

To reverse that decree, the complainants appeal.

It appears the general assembly of this State, on the 5th of March, 1867, passed an act entitled, "An act for the reformation of juvenile offenders and vagrants," by the first section of which it was provided that an institution, to be known as the "State Reform School," should be established for the discipline, education, employment and reformation of juvenile offenders and vagrants in this State, between the ages of eight and eighteen years. The management of this school was vested in a board of trustees, to consist of seven male citizens of the State, five of whom constituted a quorum to do business. The trustees were to be appointed by the Governor of

the State, by and with the consent of the Senate. A president, vice-president, and other officers were to be elected by the board out of their own number.

By section 5, it was provided, after the organization of the board, they should proceed to select a suitable site, on which should be erected this school, and the trustees were required, within four weeks from the time of their appointment, to proceed to examine and determine upon the site, and locate the same at some suitable place in or near the central portion of the State; and that, in determining such location, the trustees should take into consideration any proposition which might be made to them, and of the performance of which they should have satisfactory assurance, to give to the State the lands necessary for the site, or any materials or money to aid in the erection of the building; and it was provided that any bond or other obligation executed to the people of the State and delivered to the trustees to secure any such site, money or materials for this purpose, should be valid and binding upon the parties executing the same. It was further provided, if a site had to be purchased, the deed was to be executed to the people of the State and delivered to the auditor of public accounts—the cost of the site being limited to five thousand dollars. Laws of 1867, p. 38.

This act, evidently contemplating arrangements with private parties for cessions of land, donations of money and materials, was not satisfactory to those who were on the "look out" for chances of speculation, and having full knowledge of the great advantages resulting from the establishment of the State "Normal School" at a certain locality, and in their eagerness to promote expenditures of public money, failing to observe and appreciate the immeasurable difference between an "Infant Penitentiary" and a "Normal School," measures were taken to enlist other aids in the great enterprise.

Accordingly, in 1869, the general assembly, by an act passed on the second day of April of that year, provided that any township, county, town or city might make any subscription

in aid of this school, in money, bonds or lands, as it might deem proper, for the purpose of securing the location within its limits.

Here occurs an instance of legislative action which, to say the least, is singular, and the reason for which is difficult of conjecture, except upon one hypothesis unnecessary to be stated.

Section 3 of this act provides that the subscription provided for in the preceding section, if made by a county, should be made by resolution to be adopted by a majority vote of the board of supervisors of such county at a regular or special meeting thereof; if made by a township, by resolution of the supervisors, town clerk and assessor, acting as a board for the township; if by a town, by a resolution or ordinance of the board of trustees; if by a city, by a resolution or ordinance thereof passed in the usual manner of resolutions or ordinances by such town or city; to which is added this singular proviso: *Provided,* that no such subscription shall be made by any township, town or city until the proposition to make it shall have been submitted to a vote and adopted by the legal voters of such township, town or city by a majority of all the votes cast at an election to be held for that purpose.

Counties being omitted from this proviso, their taxables to have no voice in the matter, are restored to favor by the next section. By that it is provided that the township, county, town or city making any subscription by virtue of that act, was authorized to provide for the payment of the principal and interest of such subscription by a tax upon the taxable property of such county, township, town or city, to be ordered by the authorities thereof and collected in the same manner that other taxes are collected in such county, township, town or city.

It is this legislation appellants attack, and deny its validity, in view of the provisions of the constitution of the State on the subject of taxation by corporate bodies.

Those provisions have, more than once, been considered by this court, especially in the Park cases, so called, reported in 51 Ill. 17, and onward.

The power to levy taxes is found in section 2 of article 9 of the constitution of 1848, in force when the acts in question were passed. That section is as follows: The general assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property.

In the exposition given of this section in the Larned case, 34 Ill. 203, it was considered that equality and uniformity were the leading principles of the system.

Tested by this clause, it is very apparent the taxable inhabitants of Livingston county, to promote a State institution, for which the property owners in every county of the State are taxable in proportion to the value of their property, are required to pay a greater share of taxes for the same object, in the benefits of which they can only participate in common with the other counties of the State. The adjoining county of LaSalle is only required to pay, on its taxables, its ratable share of the expense of this State institution, whilst the taxables of the county of Livingston are required to pay not only this amount, but the additional amount imposed by this action of the board of supervisors, and to be collected by sale of their property, if necessary. In this view, the tax levied to pay these bonds was illegal.

But as to the bonds, is the county liable to pay them? Did competent authority exist to issue them?

Section 5 of the same article provides that the corporate authorities of counties, townships, school districts, cities, towns and villages, may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same.

What is a tax for corporate purposes? This question is answered, in part, in *Taylor* v. *Thompson et al.* 42 Ill. 9, where

it was said to mean a tax to be expended in a manner which shall promote the general prosperity and welfare of the municipality which levies it.

That was a case where a tax had been levied under legislative authority, to pay bounties to persons who should enlist or be drafted into the army of the United States. On due consideration, this court was of opinion that a tax levied for the purpose of saving a community from the evils inseparable from a draft, might be fairly considered a tax for the common good of the municipality, and therefore a legitimate corporate purpose. But in that case a vote of the people authorizing the tax was first to be taken, and the people voted the tax. This was an important fact in determining the case, and the court went far enough in upholding this tax.

It may be difficult to determine with precision what is a "corporate purpose" in the sense of the constitution, but it is less difficult to decide what is not such a purpose. The true doctrine is, such purposes, and such only, as are germane to the objects of the creation of the municipality, at least such as have a legitimate connection with those objects, and a manifest relation thereto. A view more liberal and extended than this might involve these corporations in much embarrassment, inviting them to prodigal taxation and a lavish expenditure of its proceeds in works more fanciful than really promotive of the best interests of the municipality.

It will be conceded, we think, by every candid and disinterested mind, that it is not a corporate purpose to provide a location for a State institution, such a purpose as shall justify the authorities of the corporation to impose upon the property owners an onerous tax to pay the expense.

It was the duty of the general assembly to determine, for the whole people of the State, the necessity of a State Reform School. Deciding it was necessary, the enterprise should be promoted by the resources of the State. An offer to receive a donation from a particular locality to secure its location seems inconsistent and degrading to a State boasting of its

sovereignty, its wealth and unbounded resources. This species of legislation has not reflected honor upon the State, nor should it.

If a public institution is needed, the whole State should be regarded, and it should be established where it will best promote the interests and well being of the whole people.

What peculiar interest have the tax-payers of Livingston county, or non-residents owning property therein, in such an institution being located in their midst? What corporate purpose does it specially promote by such, its location? What is a reform school? It is a penitentiary on a small scale, as is evident from the statute cited. How can it be a corporate purpose to establish what all admit is a necessary evil, a State Reform School, in any town? It is a State, not a corporate, purpose. It is a necessary evil, which no town, alive to its own prosperity and well being, would desire to have within its limits. It would not invite a desirable population into its neighborhood. No costly dwelling or other structures of value or ornament will rear their fronts in its neighborhood. On the contrary, its poisonous influences will be felt and mourned through each revolving year. Who would desire to live in the immediate vicinity of the State penitentiary? Would the site be selected by a man of taste or ordinary culture and discernment? The difference between that and this State Reform School is only in degree—both are necessary evils, the neighborhood of which decent people desire to avoid.

But it is said the county has paid one year's taxes on these bonds, and thus given them vitality. It will be perceived the same board of supervisors who, by their resolution, authorized their issue, made provision for the interest and paid it. They of course would be unwilling to repudiate their own offspring, and so provided for its sustenance. We infer from the record their conduct in this regard underwent the scrutiny of the people at the next election, and they most emphatically repudiated the whole scheme.

It is urged, as a reason why these bonds should be held valid, that they are in the hands of innocent holders. The answer to this is, when the action which gave them birth was illegal, as contrary to the constitution, there can be no innocent holders.

We are satisfied these bonds were not issued for a corporate purpose, and no' tax can be rightfully levied to provide for their payment, or for the accruing interest thereon ; and the funds in the hands of the county treasurer destined for such purpose is the property of the tax-payers paying it, and justice requires it should be refunded to them.

The decree of the court below is reversed and the cause remanded, with directions to grant the prayer of complainants' bill.

*Decree reversed.*

Mr. JUSTICE SCOTT dissenting.