GILBERT J. BURR *et al.*

*v.*

THE CITY OF CARBONDALE.

1. CONSTITUTIONAL LAW—*locating State institutions in locality bidding the highest.* The act of April 19, 1869, entitled "An act to authorize cities and towns in Southern Illinois to issue bonds in aid of the Southern Illinois University," taken in connection with the charter of the University, which makes the location of that institution to depend upon the aid and inducements which may be offered in the different localities, is not liable to any constitutional objection, although such legislation is not calculated to advance the credit and renown of the State, and in the judgment of the court, is unwise and impolitic.

2. SAME—*taxation of one locality more than its just share in a State expenditure.* Where a law authorized the imposition of a tax in a county, without any vote of the people, to aid the State in establishing a State institution therein, and the taxable property of such county was also required to bear its proportion of taxation equally with that in the other counties as to the residue of the cost, it was *held,* that the first tax was compulsory taxation under the general power to tax, and in violation of the constitutional provision requiring such taxation to be equal and uniform.

3. SAME—*whether a tax voted for the location of a State institution of learning is for a corporate purpose.* Where the people of a city, under the authority of a special act of the legislature, voted that the city should donate $100,000 in aid of the Southern Illinois Normal University in the event it should be located in such city, and it was so located, and the bonds regularly issued and put in circulation, it was *held,* on bill filed by the city to enjoin the collection of taxes assessed to pay interest on the same, that such debt was incurred for a corporate purpose within the meaning of the constitutional provision allowing taxation for corporate purposes, and

that as the taxation was *voluntarily* imposed, its collection would not be enjoined.

4. MUNICIPAL BONDS—*not invalidated by mere irregularities.* Where municipal bonds are issued in the exercise of a power constitutionally conferred, they will be binding upon the municipality, although irregularities may have occurred in the form of the notice of election and the like, not going to the power. The acts of such bodies, done under lawful power and in substantial conformity to the power, are binding. But where such bonds are issued under a void authority, or without authority, they will be void, into whatever hands they may come, and there can be no innocent holders of them.

5. There is a distinction to be observed between the want of power to issue municipal bonds, and irregularities in the exercise of the power, the latter being unavailing against *bona fide* holders without notice of the irregularity.

6. CONSTITUTIONAL LAW—*release of indebtedness to State.* Section 23, article 4, of the present constitution, which provides that the General Assembly shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or individual to the State, was not intended to embrace a release of claims doubtful or hazardous which the State may hold against a municipal or other corporation.

7. MUNICIPAL BONDS—*given to fund debts.* Where the legislature authorized the Governor to deliver up to a city $100,000 of its bonds, which were valid obligations, upon the payment of $30,000, and the city to raise the latter sum, under the act of March 26, 1872, entitled "An act to enable counties, cities, townships, school districts and other municipal corporations to take up and cancel outstanding bonds and other evidences of indebtedness, and fund the same," issued its bonds to the amount of $40,-000, which were sold, and the proceeds paid to the Governor, it was *held*, that if the action of the legislature was in violation of section 23 of article 4 of the constitution, the city would, nevertheless, be liable upon the bonds last issued by it.

8. SAME—*whether issued for a corporate purpose.* Where a city issued $40,000 of its bonds under legislative authority and upon a vote of its legal voters, whereby it was relieved from the payment of over $100,000 of its prior indebtedness, it was *held*, that the bonds last issued were for a corporate purpose.

9. SAME—*to purchase lands for donation to secure the location of a State institution.* And where, in pursuance of an act of the legislature, such city was also authorized to give lands, etc., to aid in the establishment and foundation of a university, and for that purpose purchased grounds, etc., and submitted to vote of the people the question of issuing $30,000

of corporate bonds to make payment, which was carried, and there appeared no fraud, combination or oppression, it was *held*, that these last bonds were issued for a corporate purpose, and were valid obligations against the city.

WRIT OF ERROR to the Circuit Court of Jackson county; the Hon. MONROE C. CRAWFORD, Judge, presiding.

Mr. WM. J. ALLEN, and Mr. D. H. BRUSH, for the plaintiffs in error.

Mr. ANDREW D. DUFF, for the defendant in error.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:*

. This was a bill in chancery, in the Jackson circuit court, exhibited by the city of Carbondale, to enjoin the collection of taxes assessed to pay interest on certain bonds issued by that city under the act of March 9, 1869, of April 19, 1869, and March 29, 1872, in aid of the Southern Normal University. To the bill, the county treasurer, the collector of taxes, and the unknown bondholders, were made defendants.

The main charge in the bill is, that these several acts were passed by the legislature without competent constitutional authority, and the acts done under them consequently void and of no effect.

The prayer of the bill was to enjoin these officers from acting in the premises—from collecting the taxes levied for the payment of interest upon the bonds, and from paying the money on the interest coupons, collected for such purpose, and also to restrain the holders of the bonds from proceeding to collect the interest or principal thereof by action at law, by *mandamus* or otherwise.

A general demurrer to the bill was interposed, which, on argument, was overruled, and the court decreed in all things as prayed.

*This case was decided at the January Term, 1874.

To reverse this decree the defendants bring the record here by writ of error.

The bill alleges these several acts to be unconstitutional and void, and charges specially, that the act of the 19th of April, 1869, and that portion of the tenth section of the charter of the Normal University which favors the selling out the location of this university to the highest bidder, under and by virtue of which all of the bonds of the city have been issued, are and were void, because of being against public policy; and that the act itself is in conflict with section 5 of article 9 of the constitution of 1848, and therefore void, and that all the bonds of the city mentioned in the bill were issued without authority of law, in violation of the State constitution, and therefore void.

The bill also charges that the levy and collection of taxes within the corporate limits of the city for the payment of interest or principal of these bonds, are in violation of section 2 of the same article of the constitution.

These are the principal and only important charges in the bill, on which the controversy turns.

An able argument has been presented by appellee in support of the decree, which we have attentively read and maturely considered. It is based on the charges in the bill we have specified, and the authority for the argument is, in great measure, the opinion of this court in the case of *The Board of Supervisors of Livingston County* v. *Weider,* 64 Ill. 427. If this case is like that in any or all of its prominent features, it must be decided in the same way.

The charge in the bill is, that the act of the 19th of April, 1869, and that portion of the charter of the university which favors the selling out the location of this institution to the highest bidder, under which the bonds in question were issued, were void, "because of being against public policy."

The charter is found among the Session Laws of 1869, at page 34, and is entitled "An act to establish and maintain the Southern Illinois Normal University." The first section

of this act provides for a corporation by the name of the Southern Illinois Normal University, with the usual rights, powers and privileges of corporations.   Section 2 declares the objects to be to qualify teachers for the common schools of this State by imparting instruction in the art of teaching, etc.   Section three vests the powers of the corporation in a board of trustees, to be appointed (Sec. 4,) by the Governor and Senate, prescribing their term of office, etc.   By section 5 they are to hold their first meeting at Centralia, at which meeting a president and secretary of the board are to be chosen, who were to be members of the board, and cause a regular record to be kept of all their proceedings.   A treasurer was also to be appointed, not a member of the board, and to give bond.   By section 6 the treasurer's duties are prescribed. The subsequent sections are matters of detail.

Then follows section ten, to which exception is taken by appellee as unconstitutional, because against public policy : ·

Section 10.   The trustees shall, as soon as practicable, advertise for proposals from localities desiring to secure the location of said Normal University, and shall receive, for not less than three months from the date of their first advertisement, proposals from points situated as hereinafter mentioned, to donate lands, buildings, bonds, moneys, or other valuable consideration, to the State in aid of the foundation and support of said university, and shall, at a time previously fixed by advertisement, open and examine such proposals and locate the institution at such point as shall, all things considered, offer the most advantageous terms.   The land shall be selected south of the railroad or within six miles north of said road passing from St. Louis to Terre Haute, known as the Alton and Terre Haute Railroad, with a view of obtaining a good supply of water and other conveniences for the use of the institution.

It is unnecessary now to notice any other provisions of that act.   Its object and purpose is plainly perceived.

We will now quote such portions of the act of April 19, 1869, as are necessary to a proper understanding of the case. It is entitled "An act to authorize cities and towns in Southern Illinois to issue bonds in aid of the Southern Illinois University." Sess. Laws 1869, p. 297.

The first section provides, that the city council of cities, and the board of trustees of incorporated towns in Southern Illinois within the limits designated for the location of the Southern Illinois Normal University, are hereby authorized and empowered, in each of said cities and towns, to issue bonds in such amounts as said city council or board of trustees may determine upon by ordinance, not exceeding one hundred and fifty thousand dollars, payable in not less than five years nor in more than twenty years, and bearing seven per cent interest per annum ; which said bonds, or the proceeds arising from the sale thereof, to be used by the said city council or board of trustees in aid of the Southern Illinois Normal University, if the same is located at any such city or town issuing said bonds.

Section 2 provides, that a tax shall be annually levied on all the property listed for taxation in said city or town, to pay the interest and principal on such bonds as may be issued under the provisions of this act; which tax, when collected, shall be deemed a special fund, and shall be used for no purpose other than the payment of said principal and interest. Said tax shall be assessed and collected in said city or town in the same manner as taxes are assessed and collected in such city or town for corporation purposes.

Section 3 provides, before any such bonds shall be issued, an election shall be first had in any such city or town as the people thereof may desire to avail of the provisions of this act, to determine whether such bonds shall be issued. A certain notice of the election is to be given, all tickets to be prepared with the words "for the loan," or "against the loan," and no bonds shall be issued or tax assessed, unless a majority of the votes cast be for the loan ; only qualified voters to

vote, and the notice shall give the amount and duration of the bonds.    No other portions of this act need be noticed.

In the able argument of the defendant in error, the successful party below, and the party who had issued the bonds in question, the right to avoid their payment or the interest upon them as stipulated on their face, is placed upon three grounds : *First.* That the principle and spirit of the act of April 19, 1869, is contrary to good morals and public policy.    *Second.* That a tax levied to pay bonds issued under this law would be a State tax, and therefore a violation of section 2 of article 9 of the constitution of 1848.    *Third.* That such tax would not be levied for a corporate purpose, within the meaning of section 5 of the same article of the constitution.

In support of the first proposition, counsel rely on the case of *Livingston County* v. *Weider, supra.*    There are some strong expressions in the opinion in that case, but, as we read it, it fails to establish the proposition advanced.    We think now, as we thought then, that such modes of providing State institutions hardly comports with the dignity of an independent and wealthy State, possessed of abundant resources.    Setting up the location of State institutions to the highest bidder is, in our judgment, impolitic and unwise, resulting, in many cases, most disastrously to the best interests of the State.    It should be the paramount object in locating public institutions, to place them where the interests of the State demand them, and not to promote individual interests, however strongly fortified by money or by representation.    By the power of money, the very place least fitted may become the chosen spot, whilst those having every required advantage are overlooked.    It gives occasion to bargaining and corruption, or at least strong suspicion thereof, for it is argued, if a locality can afford to offer such large inducements, is it not natural and reasonable to suppose they will supply others, so that success may be certain?    It is humiliating to our State pride that resort should be had to such means, but this court has never said or entertained the opinion it was against the constitution

so to legislate. It was not so decided in the Livingston county case, nor in any other. It may be the court went out of its way in saying as much as it did on this point, in that case, but the most mature reflection upon the whole subject has satisfied us that such a course of legislation is not calculated to advance the credit and renown of the State. Further than this, in this respect, that case does not go.

The second point made by complainants is, that a tax levied to pay bonds issued under the act of April 19, 1869, would be a State tax, and therefore a violation of sec. 2 of art. 9 of the constitution of 1848.

This point brings in review some of the considerations involved in the opinion in the Livingston county case, and were the facts the same, the conclusions would of necessity be the same.

That was a case where the county authorities, without the vote of the people, were allowed to make a subscription in aid of a reform school for juvenile offenders and vagrants, established as a State institution, by resolution, to be adopted by a majority of the board of supervisors, at a regular or special meeting, whilst the same law required, if a township, town or city desired to subscribe, the proposition to make the subscription should first be submitted to a vote, and adopted by the legal voters of such township, town or city by a majority of all the votes cast.

The taxables of the county had no voice in the matter, but were taxed to provide for the payment of the principal and interest of such subscription as the board, without their consent, might make, and to be collected in the same manner that other taxes were collected in the county, township, town or city.

It was this legislation which was attacked, and its validity denied, in view of the provisions of the constitution on the subject of taxation by corporate bodies.

The court then quoted sec. 2 of art. 9, on the general subject of taxation, and the Larned case, 34 Ill. 203, holding

that equality and uniformity were the leading principles of the system, and then argued that, tested by this clause, it was very apparent the taxable inhabitants of Livingston county, to promote a State institution for which the property owners in every county of the State are taxable in proportion to the value of their property, were required to pay a greater share of taxes for the same object, in the benefits of which they can only participate in common with the other counties. The adjoining county of La Salle was only required to pay on its taxable property its ratable share of the expense of this State institution, whilst the taxables of Livingston were required to pay, not only this amount, but the additional amount imposed by the action of the board of supervisors, and to be collected by the sale of their property if necessary.

Here, the court was speaking of taxes imposed *in invitum*. of compulsory taxation under the section quoted. Such taxes, we have always held, must have for their basis equality and uniformity, and showed wherein these principles were disregarded by this law. It was compulsory taxation under the general power to tax, and was held illegal for the reasons given, and which, we think, are sound and conclusive.

Is this the case here? Had the county authorities of Jackson county, without a vote of the people, levied a tax on the property of the whole county to pay the principal and interest of these bonds, it would be the Livingston case repeated, and the collection of the tax would be enjoined, and the bonds issued by the arbitrary will of the authorities would be held invalid.

The next question discussed was, were the bonds issued by competent authority? And in arguing that question, the court quoted sec. 5 of the same article (9): "The corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

We then endeavored to answer the question, what is a tax for a corporate purpose? and said it was answered in part in *Taylor* v. *Thompson et al.* 42 Ill. 9, where it was held to mean a tax to be expended in a manner which should promote the general prosperity and welfare of the municipality which levied it. But in that case, a vote of the people authorizing the tax was first to be taken, and the people in fact voted the tax. This was an important fact in determining that case.

We thought it difficult to determine with precision what was "a corporate purpose," in the sense of the constitution, but came to the conclusion it was such a purpose, and such only, as might have a legitimate connection with objects and purposes promotive of the welfare of the municipality and a manifest relation thereto.

We then endeavored to show it was not a corporate purpose to provide a location for a State institution—such a purpose as shall justify the authorities of the corporation in imposing upon the property owners a tax to pay the expense.

This very clearly has reference to a tax imposed *in invitum* —compulsorily, under the taxing power previously commented upon.

We then undertook to show that the location of this school for vagrants specially promoted no corporate interest of the county; that the tax-payers of the county, or non-residents owning property there, could have no peculiar interest in having such an institution located in their midst, and questioned its advantages, holding it, like the penitentiary, an evil, and not to be desired by any town.

It will be perceived the stress of the argument and reasoning of the court is placed on the facts of that case. It was an imposition of a tax, without the consent of the people, under the pretext it was for a purpose beneficial to the whole county, and therefore a corporate purpose. This was controverted. But that is not this case. Here, complainants, by a vote of the citizens and property owners of their municipality, voluntarily imposed this tax upon themselves, being

authorized so to do by a law of the State, which the General Assembly had the constitutional power to pass, however impolitic it may have been.   The property owners vote these bonds, the institution is established at Carbondale, the complainants or their predecessors issue the bonds, they pass from hand to hand, interest is regularly paid on them, their validity never questioned, until it is thought a loop-hole of escape from further payment of interest is discovered, of which the city, to her discredit be it said, seeks to avail.   To make this case like the Livingston county case, it would be requisite the authorities of the county should have imposed this tax upon the taxables of the county for a purpose local to Carbondale alone, and therefore not corporate as to the county. So, in the Livingston county case, had the citizens and tax payers of Pontiac voluntarily imposed a tax upon themselves under the authority of a law passed for such purpose, for the location of the Reform School within its limits, and issued their bonds, and we could be satisfied it was a legitimate corporate purpose, the bonds would not be held invalid.   But it was claimed it was a corporate purpose, so far as the county was concerned, which we could not see, and as the people had not voted for it—had no voice in the matter— the levy of the tax, for the reasons there given, violated the principles of equality and uniformity.

How different is this case? They have been briefly pointed out.   Whilst the location of the Reform School was not a corporate purpose for Livingston county, subjecting all its property owners to compulsory taxation, the location of an institution of learning—an university—founded and fostered by this great State, can not fail to give character and notoriety to the place of its location, and in a greater or less degree enhance the value of property there, independent of any exclusive advantages to be derived by its citizens in fitting pupils as teachers in the various branches of education.   Still, it can not be seriously questioned its location at Carbondale so blends the interests of its people with the institution, as to

30—76TH ILL.

prompt an unhesitating acquiescence in the conclusion that the tax was for a legitimate corporate purpose, germane to the welfare and best interests of the municipality imposing the same.

These considerations dispose of the third point raised.

In addition to what we have said on the second point, it can not fail to be observed that the strong ground upon which we placed the Livingston county case was, that the principles of equality and uniformity were disregarded in this, that the tax payer of Livingston was compelled to pay for a State institution, not only the same proportion of taxes a property owner in La Salle had to pay, but, in addition, this tax assessed against the same property. Consequently there was inequality. But had the people of the county voluntarily voted this additional tax under an enabling law, the principle of equality could not be alleged to have been disregarded. It would not be *in invitum* and compulsory. Most courts, this among others, have held subscriptions to railroad companies, to aid in the construction of a railroad through a county or through a town or city, and bonds issued in pursuance thereof, are valid, if the affirmative voice of the people of the municipality has been had. The power of the legislature to authorize such municipalities to issue bonds or to tax themselves in aid of such improvements, has never been successfully questioned. The location of an university, though not a kindred subject, seems to be one worthy the consideration of a municipality— so worthy and so deserving as to be deemed a corporate purpose, and to which the principles of those cases will well apply.

It may be difficult to define precisely what is a corporate purpose in the sense of the constitution. We said in *Taylor v. Thompson, supra,* that levying a tax to pay military bounties whereby the town might escape a draft, was for a corporate purpose, the court holding that this purpose had a legitimate connection with objects and purposes promotive of the welfare of the municipality and a manifest relation thereto.

The General Assembly would not have enacted the law in question had it not been their conviction the establishment of this university in Southern Illinois would promote the welfare of that municipality which should succeed in obtaining the location, and the same may be said of the vote of the people of Carbondale, offering these bonds and lands for the location. This vote is the highest evidence from those most interested, that its establishment in their midst would tend to their benefit. The expenditure of two hundred and fifty thousand dollars on the construction and embellishment of the building located within the corporate limits of the city, with the necessary residences for the accommodation of the various professors, teachers and officers which such an institution requires, must add to the taxables of the city. The annual expenditure by the State in its support will operate in the same direction. Can it be doubted that the establishment of the State charitable institutions at Jacksonville, in Morgan county, has contributed greatly to the growth of that place, enhancing the value of real estate and giving it prominence over municipalities of the same class in other parts of the State?

The establishment of the Normal school at Bloomington, furnishes an apt illustration of the benefits derivable from such an institution. That school was established by an act of the General Assembly of February 16, 1857, and proposals were invited as in this case. It appears, from the brief of appellants, and such we understand is the fact, that soon after the passage of this act and the acceptance of the offer of this particular tract of land for the location of this "school," the town of Normal was surveyed and platted, and in 1870 its population, by the census of that year, was eleven hundred and sixteen. The population of Bloomington in 1860 was six thousand nine hundred and thirty; in 1870 it had increased to fourteen thousand five hundred and ninety, more than one hundred per cent! It has been supposed, some portion of this vast increase might be fairly attributed to the

establishment of this school and its successful operation in its immediate vicinity, whilst Normal, from a prairie farm, is now a town of more than ordinary pretensions.

It is true, as urged by appellee's counsel, the act under which this university was created gives to the resident of Carbondale, or Jackson county, no special advantages for admission within its precincts over those of any other county in the State. The same may be said of a railroad. No municipality, by donations or by subscriptions to its stock, secures any advantages not enjoyed by the public at large in the transportation of themselves or their property. The enhancement of the material interests of the municipality renders such donations and subscriptions valid, and the taxes levied to pay them rightfully imposed, as for a corporate purpose.

This university is under the fostering care of the State, and under the provisions of the law it may be expanded to vast proportions. It may be the germ of an institution which, in time, may rival the most famous institutions of learning of other countries and states.

We are constrained to believe, the purpose for which these bonds were issued was a corporate purpose, and the tax levied to pay the interest on them valid, and its collection should be enforced.

The case of *Musick et al.* v. *Inhabitants of Amherst et al.* 12 Allen (Mass.) 500, supports the views we take of this case.

It has always been the policy of this State to afford means for the education of the youth of the State, and a duty also. A normal university enters into our plan of education, wherein teachers of our youth shall be taught how best and most effectually to discharge their duty.

The bill of complaint states fully and clearly that each subscription on which these bonds were issued was voted for by a majority of the votes cast at such election. It alleges further, that the subscriptions were duly made by the city council, and the bonds which were issued contained recitals of their being issued in pursuance of law, and that they were all,

subsequent to the issue, repeatedly ratified by the city authorities making assessments, collecting the taxes and paying the interest on them. The bill charges no fraud, and the inference is reasonable, from the allegations in the bill, that these bonds are in the hands of innocent holders, ignorant of any irregularities if such there were prior to their issue.

We said, in the Livingston county case, that, as the action which gave birth to the bonds was illegal and contrary to the constitution, there could be no innocent holders. These bonds having been issued in the exercise of a power constitutionally conferred, must be binding on the municipality, although some irregularities in the form of notice of the election, want of the precise words on the ballots, and others of like character, may have occurred.

The principle has always been acknowledged by this and other courts, that the acts of a municipality done under a power, and in substantial conformity to the power, are binding. Bonds issued by a municipal corporation to aid in the construction of a railroad, if issued in pursuance of a power conferred by the legislature, are held valid commercial interests; but if issued by such a corporation which possessed no power from the legislature to grant such aid, they are invalid, even in the hands of innocent holders. *St. Joseph Township* v. *Rogers,* 16 Wallace, 644.

So, by parity of reasoning and analogy, if a municipal corporation, authorized by law, issue its bonds in furtherance of a corporate purpose, and in substantial compliance with the law authorizing their issue, and such bonds come into the hands of an innocent holder, even if there be irregularities not going to the power, the bonds must be held valid. If the power existed, the act is binding. The principal question to be determined is one of power. This is the drift of the reasoning of this court in *Marshall County* v. *Cook,* 38 Ill. 44. Where the power to issue bonds existed, the corporation is estopped from setting up irregularities in the issue of the bonds after repeated payments of interest thereon. *Town of*

*Keithsburgh* v. *Frick*, 34 Ill. 405 ; *Mercer County* v. *Hubbard*, 48 ib. 139.

The rule may be considered settled, that a municipal corporation may successfully defend against bonds, in whosesoever hands they may be, if its officers or agents, who assumed to issue them, had no power to do so. The distinction must be ever remembered between want of power to issue the bonds and irregularities in the exercise of the power, the latter being unavailing against the *bona fide* holder without notice of the irregularity. 1 Dillon on Mun. Corp. 524.

It appears, from the bill, that the trustees of the university, in the month of May, 1869, provided, under the tenth section of the charter, (act of March 9, 1869,) quoted above, and under the first section of the act of April 19, 1869, also quoted, to advertise for proposals from the towns and cities desiring to secure the location, inviting them to send in their bids in the shape of lands, buildings, bonds, moneys, etc.; and that, after so advertising, on the 16th of July thereafter, and in pursuance of due notice given, an election was held in the city of Carbondale for the purpose of voting upon this question : Shall the city of Carbondale appropriate to the State of Illinois its bonds to the amount of one hundred thousand dollars, for the purpose of securing the location of the Southern Illinois Normal University at Carbondale? The result of the election was, that a majority of the ballots cast thereat, had the words "for the loan" written or printed thereon.

It also appears, from the bill, that the city council, at a regular meeting thereof, on the 29th day of the same month of July, adopted an ordinance appropriating one hundred thousand dollars by the city, in bonds of the city, to the State, to aid in the erection and maintenance at that city of this university. By the second section of this ordinance, these bonds were to be tendered by the mayor of the city, in the name of the city, to the trustees of the university, as the proposition of Carbondale to secure its location at that place.

It also appears, by the bill, that a short time prior to the 13th of September, 1869, the board of trustees located the university at the city of Carbondale, and on the said 13th day of September, the city council passed an ordinance directing the issue of one hundred thousand dollars in bonds of the city, to be issued in the denomination of five hundred dollars each, payable to ——, or bearer, within twenty years, and bearing seven per cent interest per annum, and, by a subsequent ordinance, were made payable at the office of the city treasurer of the city of Carbondale.

It appears by the bill these bonds were engraved and issued, bearing date January 1, 1870, payable as above; that the same, on the 12th of that month, were delivered by the city of Carbondale to the trustees of the university, who receipted for them.

As we understand the points made by complainant, no objection, on the score of irregularity, is taken to any of these proceedings.

Then, on the 12th day of January, 1870, the proposals of the complainant were finally consummated by the delivery of the bonds to the trustees, who delivered them to the contractor for the work.

Whilst these bonds were so situated, the General Assembly, on the 15th of April, 1871, passed an act entitled "An act to appoint commissioners to construct the Southern Illinois Insane Asylum and the Southern Illinois Normal University, and to make an appropriation therefor."

By this act the construction of this university was taken out of the control of a board of trustees and lodged with three commissioners to be appointed by the Governor and Senate.

By section 6 of this act, they were required to examine the contract the trustees had made for the construction of the university; to examine and determine if the contract was in full force; to examine the plans and specifications, etc., and determine if they could be abridged, so that the expense

might be curtailed, and to continue the contract, if expedient, and allow the contractor, out of the fund hereinafter appropriated, the amount due him for extra work; and it was provided, on making a settlement with the contractor, he should return to the commissioners all the assets paid and delivered him by the former board of trustees which remained unexpended in his possession, "including one hundred thousand dollars in bonds issued by the city of Carbondale"—the commissioners to deposit these bonds with the Governor. Sess. Laws 1871, p. 274.

At the adjourned session of the General Assembly, held in November, 1871, a joint resolution was adopted instructing the Governor to sell these bonds to the city of Carbondale for no less than thirty thousand dollars in full of said bonds and the interest that had accrued on them, "which amount, when so paid, shall be transferred to the commissioners of the said Southern Illinois Normal University, located at Carbondale, to be used by them in the construction and completion of the same: *Provided,* that said sum of thirty thousand dollars be paid on or before the first day of July, 1872." Sess. Laws 1871, p. 785.

The General Assembly, on the 26th of March, 1872, passed an act, in force on that day, entitled "An act to enable counties, cities, townships, school districts and other municipal corporations to take up and cancel outstanding bonds and other evidences of indebtedness, and fund the same." By this act, the question was to be submitted to a vote of the people of the municipality to accept the advantages and provisions of this act.

Accordingly, it appears from the bill, on the 29th of May, 1872, in pursuance of an ordinance passed by the city council, and of notice duly given, whether the city should issue bonds under the provisions of the last cited act, an election was held in the city, by which it was decided, by a majority of those voting upon the question, that the city authorities should issue bonds to an amount not exceeding forty thousand dol-

lars, for the purpose of raising a fund of thirty thousand dollars in cash, with which to purchase these one hundred thousand dollars in bonds held by the Governor, and thus generously offered to the city for thirty thousand dollars in cash.

We can not appreciate the objection complainants, the defendants in error, make to this election. It was strictly in pursuance of law, and the bonds were to subserve a great corporate purpose : relief from a debt, self-imposed, of one hundred thousand dollars, with the annual interest, by the payment of thirty thousand dollars.

The defendants in error seem to yield the point, if the act of 19th April, 1869, is constitutional there is nothing in the objection, and we fail to perceive any. Complainants, however, do make some special objections to these forty thousand dollar bonds. Without questioning the constitutionality of this act of March 26, 1872, they insist that they show on their face an attempt to cover up an illegal transaction, by reciting that they are issued under that act. Complainants insist that act gives no authority to issue them— that it is an act authorizing certain municipal corporations to fund their debts, but they must be binding, subsisting obligations against the municipality.

As we hold the original issue of one hundred thousand dollars of bonds to be valid, and as these bonds of forty thousand dollars were to be converted into cash, in order to take them up, they must be valid if the act of March, *supra*, has been complied with. The argument of complainants is, as the original issue was invalid, those which are to discharge must also be invalid. But they contend, if the original issue was legal, then they insist that the resolution of the General Assembly of 1871, authorizing the Governor to sell them to the city issuing them, is an infraction of section 23, of article 4, of the present constitution. That section is as follows : "The General Assembly shall have no power to release or

extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or individual to this State."

We can not suppose this provision was designed to embrace a case like this. If it does, then the original issue being held valid, those bonds are still binding upon the city. and they must pay them. But we do not think this section of article 4 was intended to embrace a release of claims doubtful or hazardous, which the State might hold against a municipal or other corporation or individual. On the face of those bonds the State was not named as the obligee. They do not purport to be an undertaking in which the State is a party. They had become the property of the State, which the Governor, under the resolution, was authorized to sell to the obligors for less than one-third of their nominal value. The bonds were payable to ————, or bearer—not to the State. It was a question for the legislature, when the bonds came into the possession of the State, what, under the circumstances, was best to do with them. The result appears in the joint resolution.

But if this joint resolution contravenes this section of the constitution, could it affect the validity of these bonds, having in view the act of March 26, 1872, authorizing counties, cities, etc., to take up and cancel outstanding bonds and other evidences of indebtedness, and fund the same? But independent of this act, under the authority of *The City of Galena* v. *Corwith*, 48 Ill. 423, the city would have this power.

These bonds thus issued were sold by complainants' agent, and the proceeds thereof, being twenty-eight thousand dollars in cash, were paid over to the Governor, who, thereupon, surrendered ninety-three thousand of said one hundred thousand dollar bonds, leaving seven thousand dollars in bonds in his possession, and about which there is no controversy. The interest on these bonds thus surrendered to the city amounted to more than ten thousand dollars, so that by this arrangement the city paid a debt of one hundred and three thousand dollars with the proceeds of these forty thousand dollars. It

surely does not become the city now to attempt their repudiation.

These bonds were regularly voted, issued and sold by complainants in the city of New York, reciting on their face that they were issued under the funding act above mentioned, and by virtue of the ordinances of the city, after a vote of the voters of that city had been taken, authorizing their issue. These bonds are commercial instruments, are now in the hands of innocent holders, for value, without notice of any infirmity, and they must be paid. See authorities referred to *supra.*

In another view these bonds are valid and binding, having been issued for a corporate purpose, which purpose was to relieve the city from the payment of more than sixty thousand dollars of valid indebtedness. No one will deny this was a purpose closely connected with the best interests and welfare of the municipality, and therefore "a corporate purpose."

Complainants also question the validity of the bonds for thirty thousand dollars, which were issued by them, which, with the forty thousand, and the seven thousand of the original issue of one hundred thousand, yet in the hands of the Governor, are the subject of this controversy.

Now, as to these thirty thousand. Holding, as we do, the act of April 19, 1869, to be in conformity with the constitution, all that has been legally done under that act must be upheld. Complainants make the point, when the city voted the hundred thousand dollars of bonds under the provisions of this act, the power had been exercised and exhausted—the trustees had accepted the bid, and in consideration thereof located the university at Carbondale. But this election was held to determine whether the city should issue thirty thousand dollars in bonds, carrying seven per cent per annum interest, and payable within five years, in payment for the Southern Illinois College property, and lots Nos. 58, 60, 61, 62, purchased by the city and donated by it to the Normal. It is complained, there was no election by the people to

determine whether the city should contract a debt of $30,000 for this real estate ; no election by the people to say or determine whether this real estate should be handed over as a gift. to the State of Illinois—but these matters were all arranged without consulting the tax-payers or the law, but in the absence and defiance of the law.

What does the act referred to provide? We see, by reference to the first section, that city and town authorities in incorporated towns in Southern Illinois, within certain limits designated for the location of this university, were authorized and empowered, in each of them, to issue bonds, in such amounts as they might determine upon by ordinance, not exceeding one hundred and fifty thousand dollars, payable in not less than five years, nor in more than twenty years, and to bear seven per cent interest per annum. The statute then declares, "which said bonds, or the proceeds arising from the sale thereof, to be used by the said city council or board of trustees in aid of the Southern Illinois Normal University, if the same is located at any such city or town issuing said bonds." Sess. Laws, 1869, p. 297, *supra.*

The only limitation upon the power to issue bonds found here, is, they shall not exceed in amount one hundred and fifty thousand dollars, and in such amounts and in as many different issues as the people, by their votes, might determine, keeping in view the prescribed limit.

But what are the provisions of the tenth section of the act of March 9, 1869? We have quoted it, *supra,* by which it will be perceived, proposals were authorized to give land and buildings, and bonds, moneys or other valuable consideration in aid of the support and foundation of the university. This act is the charter of the university.

The bill of complaint shows, by the first exhibit, (A), that the city appropriated not only one hundred thousand dollars of bonds which had been voted, but also authorized its mayor, in the name of and in behalf of the city, to offer these bonds, the college and grounds, and lands and other things subscribed

for that purpose, to the trustees of this university, as the bid of the city to secure to that city the location.   An ordinance was duly passed for an election to determine, as provided in the act of 19th April, 1869, whether the city council should issue bonds of the city, payable in five years, to an amount not exceeding thirty thousand dollars, at seven per cent, etc., to be used by the city council in aid of said university, in making payment of the Southern Illinois College property, and for out-lots in Carbondale, Nos. 58, 60, 61, 62, purchased by the city, and for paying for transportation of stone for the foundation of the university, and donated to the said normal university at Carbondale, the trustees having located the said university at Carbondale.   Exhibit I.   Exhibit J, which is a part of complainants' bill, shows that the election to determine the above questions was held on the 8th day of October, 1869, and that the vote was in favor of the propositions, and that an ordinance was passed and approved, providing for the issue of these bonds, to be used in the payment for the Southern Illinois College property, and for out-lots Nos. 58, 60, 61, 62, and other expenses and liabilities incurred by the city in aid of this university.

We infer from exhibit A, and from the terms of the second section of the ordinance therein, that the city had bargained for the college and grounds and these out-lots as a proper site for the university, conditioned that the university should be located at the city.   These were offered besides the bonds, as an inducement to the location, and the trustees having determined the location at Carbondale, the conditional purchase became absolute, and the city was bound to provide "ways and means" of payment, which was effected by this issue of thirty thousand dollars in bonds.   It was done by a free vote of the majority—it was in aid of the university, and, added to the one hundred thousand dollars before issued, do not exceed the limits fixed by the legislature, but are greatly within that limit.   The tax-payers were consulted, and voted, and their vote was had in conformity to law.   The bonds are in the

hands of innocent holders, and must be held valid, for the reasons we have given.

In reviewing the whole ground of this controversy, we will repeat, that the mode adopted by the legislature to locate this university does not comport with the dignity of the State, but we have never said it violated any provision of the constitution.

We can not agree with complainants, that this tax, self-imposed by the voters of Carbondale, is in violation of any provision of the constitution, and that the foundation and establishment of this university at Carbondale was not a corporate purpose, to aid in which the citizens might tax themselves as for a corporate purpose.

No charge of fraud, combination or oppression is made. Every act seems to have been fairly done, and in pursuance of law. The disreputable feature of the case is, that the same authority doing all these acts, and whose city has received the benefit of them, now seeks to repudiate them. There is no rule of law, equity, justice or morals compelling this, and we can not sanction it.

The decree of the circuit court is reversed, and the bill dismissed.                              *Decree reversed.*

Mr. JUSTICE WALKER, Mr. JUSTICE MCALLISTER and Mr. JUSTICE CRAIG dissent, on the ground that the normal school, being a State institution, can not be regarded as a corporate object of the city of Carbondale, and its erection or support a corporate purpose of such city. And we are of opinion that the vote of the people is not a circumstance which affects the question, because the 5th section of article 9, of the constitution of 1848, limits the power of taxation to "corporate purposes," and contains no provision in respect to a vote by the electors. The power is limited in the same way in the constitution of 1870. This case, in our opinion, is not distinguishable from the case of a county tax to pay the interest upon bonds given by the county of Livingston to obtain the location there of the State Reform School.