*(Superior Court of Cook County. In Chancery.)*

## Clingman

### vs.

## World's Columbian Exposition, et al.

(August 31, 1893.)

1. PUBLIC PROPERTY—DIVERSION OF—WHEN ONE OF GENERAL PUBLIC CAN ENJOIN. While it is true that one who suffers no special damage cannot enjoin public authorities from diverting land from the public use for which it was acquired, yet where relief is prayed against a private corporation to whom such land may have been turned over, one of the general public can maintain a bill in equity in his own name in behalf of all.

2. PARKS—DIVERSION FROM PUBLIC PURPOSE—POWER OF LEGISLATURE. The legislature has the right to divert the use of land the fee of which has been acquired for a public park to other than park purposes.

3. PARKS—WHAT DOES NOT CONSTITUTE A DEDICATION OF LAND FOR. The declaration of the legislature that land is to be used for park purposes for the "rest and recreation of the people and free forever" does not in law amount to a dedication of the property.

4. DEDICATION—DEFINED.  A dedication is an appropriation of land for some public use made by the owner and accepted for such use by and on behalf of the public.  This implies that there must be a giving by one party and an acceptance by another.

5. PARKS—RIGHT OF LEGISLATURE TO AUTHORIZE MUNICIPAL CORPORATION HOLDING PARK LANDS IN FEE TO CHANGE USE OF OR SELL SAME.  Where lands acquired by condemnation or otherwise are held by a municipality in fee for park purposes, the legislature can authorize a change of use of or a sale of the same.

Motion to dissolve temporary injunction.  The facts are stated in the opinion of the court.  Heard before Judges Edward F. Dunne, Theodore Brentano and James Goggin.

*William E. Mason,* for complainant.

*T. A. Moran, Levy Mayer, Walker & Eddy, Sidney Smith, John Barton Payne, George W. Miller, David Fales, William Street* and *T. H. Gault,* for various defendants.

PER CURIAM:—

This is a motion to dissolve the injunction heretofore granted in the above entitled cause, restraining the defendants, their agents, etc., from closing on Sundays that part of the South Park now occupied by the World's Columbian Exposition.

The motion to dissolve is based upon the bill of complaint and the answers filed thereto.  Able and exhaustive arguments have been heard upon the same.

In the argument of counsel for the complainant, he disclaims for his client any rights or standing in court on the ground of being a stockholder.  It becomes therefore, unnecessary for us to consider him in that capacity.

It remains for us to determine but two questions, to-wit:

*First:* Has the complainant in his capacity, solely as tax payer and citizen, such a standing in court as entitles him to bring this suit for an injunction to protect the alleged rights of himself and the general public, or must the suit be brought by the attorney general of the state, or in his name or with his consent? And if it is determined by this court that the complainant has such standing in court,

*Second:* Has the complainant the right to an injunction restraining the company from closing the gates of the park on Sundays, because Jackson Park was created by the act of the legislature of Illinois, approved February 24th, 1869, a "public park for the recreation, health and benefit of the public, and free to all persons forever" (1 Private Laws of Ill. 1869, page 358), and paid for by the taxation of property in South Chicago, Hyde Park and Lake. Or differently stated, was it not beyond the power of the state legislature, or the park commissioners, to pass any act or ordinance closing the park on Sundays or any other day.

It is contended on the part of defendants that the complainant, as an individual or a mere member of the general public, cannot come into a court of equity and claim to represent the general public, and that the suit must be brought by the attorney general of the state representing the public at large. They urge that a citizen or taxpayer who suffers no peculiar damage or injury different from the general public, by reason of the diversion of public property from the use for which it was intended at the time of its acquisition, cannot maintain a bill in his own name for any injunction to prevent such diversion of use.

This is undoubtedly the law in cases where it is sought to enjoin public or municipal authorities at the suit of a mere member of the general public. In this case, however, the writ is not invoked against the public authorities having in their charge or control public property, but it is prayed for as against a private corporation, to-wit, the World's Columbian Exposition, to whom was surrendered and given over a

public park by the park commissioners under a special act of the general assembly.

The case of *Davidson v. Reed*, 111 Ill. 167, seems directly in point. That was a bill in equity filed by a private individual to restrain another private individual from meddling or interfering with certain graves in land which had been dedicated to the public to be used as a place of burial of the dead. It was held that the complainant as a private individual could maintain the bill in his own name for the benefit of all. To the same effect is *Maywood Company v. Maywood*, 118 Ill. 61.

It appearing from the averments of the bill that the complainant has a common interest in preventing a diversion of the use of a public park to private purposes, he can in his own name maintain the suit, and it is not necessary that the attorney general be a party thereto.

Moreover, the attorney general, having reconsidered his motion to withdraw his appearance from the case, must be held to abide by his original appearance, still on file, which prays for the same relief as sought by the complainant. Such appearance has the same force and effect as if the attorney general had primarily moved in this suit.

There remains for consideration the vital question in the case: Had the legislature the power to authorize the South Park commissioners to turn over to the World's Columbian Exposition Company the land embraced in Jackson Park and in the Midway Plaisance, as provided in section three (3) of the act of August 5th, 1890 (Laws of Ill. 1890, page 4), which reads as follows:

"Sec. 3.    In case the site or sites for the holding of the said World's Columbian Exposition, as finally located and fixed by the authorities in charge thereof, shall include the whole or any part of any public park which is, or may be, under the control and management of park commissioners, then and in that event it shall be competent, and express authority for that purpose is hereby granted to the park commissioners having the control and management of such public park, *to allow the use of the same or any part thereof, for*

*the purposes of said World's Columbian Exposition,* upon such terms and conditions as may be agreed upon between the said park commissioners and the authorities having the management of said exposition.''

It is conceded that if the legislature had such power, the World's Columbian Exposition, pursuant thereto, obtained from the park commissioners, by their ordinance, the right to occupy and enclose Jackson Park and the Midway Plaisance from the first day of October, 1892, until the first day of January, 1894. Sec. 5, of the ordinance of South Park commissioners, adopted September 19th, 1890.

It is urged with great force by the learned counsel for complainant, that the act creating the South Park commissioners expressly provides: ''Which said land and premises, when acquired by said commissioners, as provided by this act, shall be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall, from time to tim, be adopted by said commissioners and their successors, for the well ordering and government of the same.'' Sec. 4, of the act approved February 24th, 1869, creating South Park commissioners (1 Private Laws Ill. 1869, page 358).

And it is forcibly contended by the learned counsel, that the language of the act clothes the property acquired by the commissioners with a public use; that it amounts, in the language of learned counsel, to ''a public dedication;'' and that the public enjoy, by virtue of this provision of the act, a usufruct in these lands for their rest and recreation which is absolutely inalienable under any law or ordinance; and that any citizen at the present time, or among the generations yet to come, may, by an appeal to a court of chancery, obtain relief by injunction against diverting these lands to any use other than the ''recreation, health and benefit of the public,'' without money and without price. And counsel claims that this usufruct in the people is a perpetuity, the enjoyment of which can never cease.

It is admitted in the answers of the defendants, that the World's Columbian Exposition has enclosed these grounds with a fence, and that they are charging an admission fee to all persons desirous of entering therein, and that it is their intention to absolutely close the same on Sunday. So that if the contention of counsel obtains, the motion to dissolve this injunction should be denied.

In support of the position taken by counsel, he has cited numerous authorities to this court. In view of the gravity of the question raised, and of the important consequences which may result by way of precedent, in case this court should determine that the legislature has the right to divert, even for a temporary purpose, the use of a public park for any other purpose than that of a park, the court has felt it to be its duty to consider with the greatest care the position taken by counsel and the authorities he has cited in support thereof.

. Such consideration has been given and as the result thereof the court is forced to the conclusion that the position of counsel for the complainant is not supported by the authorities.

In none of the cases cited can there be found a single instance of what counsel has designated "a public dedication."

In each and every case where a court of chancery has intervened to prevent the diversion of lands used by the public for streets, parks, or other purposes, it will be found that the fee to the land so used by the public rested in some private person or corporation, who had dedicated it to public use, by platting the same, or by conveying the same to the public upon certain trusts or conditions.

· The case of *The Maywood Company v. The Village of Maywood*, 118 Ill. 61, cited by counsel for the complainant, discloses the following state of facts: The Maywood Company was the owner of certain lands and recorded a plat of the same upon which appeared one block marked "Maywood Park," and issued numerous circulars and pamphlets, for the purpose of selling the lands designated in said plat, in

which assurances were given that the land so marked would
be improved and ornamented as a park.  The supreme court
held that this amounted to a dedication of the land for public
use and enjoined the company from afterwards using the
block in question for any other than park purposes.

In the case of *Davidson v. Reed, et al.*, 111 Ill. 167, also
cited by counsel, the supreme court held that there had been
a dedication by a private owner of a tract of land for ceme-
tery purposes; and that in view of such dedication, his heirs.
or grantees could not afterwards change the purpose for
which the said land was dedicated and given for public use.

The same is true of the case of *The City of Jacksonville
v. The Jacksonville Railway Company*, 67 Ill. 540.  The land
had been dedicated to the public for use as a public square
by the original proprietors by a plat duly recorded.  And
the court, in giving its reasons for enjoining the use of the
property in question for railway purposes, declared:  "The
power of the legislature to repeal the charters of municipal
corporations cannot be extended to the right to divert prop-
erty *given* to the public for one use, to a wholly different and
inconsistent use.  The power cannot exist to divert property
from the purpose for which it was *donated.*"

This clearly indicates that the ground for the intervention
of a court of chancery, was that there was a dedication by
the original owners of the fee to the public for a specific use.

The case of *The City of Morrison v. Hinkson*, 87 Ill. 587,
was a case in which a citizen sought to recover damages at
common law for injuries to his property resulting from the
running of a public waterworks, by the city, on one of the
public streets of the same.  It was not disclosed in the record
in whom the fee title to the street rested, and the supreme
court simply held that a citizen could recover special damages
for injuries to his property occasioned by the running of the
waterworks.  No question of the diversion of the public use
of the street was raised.

The case of *Grogan v. The Town of Hayward*, 6 Sawyer,

498, 4 Fed. 161, was also a case of dedication by a private owner to a special public use.

This is also true of the cases cited by counsel, *Carter v. Chicago*, 57 Ill. 283; *Price v. Thompson*, 48 Mo. 361; and *Sheen v. Stothart*, 29 La. Ann. 630, which were all the cases referred to by counsel in which a court of chancery interfered to prevent the diversion of the use of public property to other than public uses, or to a different public use.

The plain distinction between this class of cases and the case at bar, rests in the opinion of this court, in the fact that in the case under consideration, the land acquired by the South Park commissioners was not donated to public use by private owners, clothing it with a special use for the benefit of the public, and retaining the ownership of the fee in the donator or dedicator. The lands held by the South Park commissioners were acquired by them by purchase or condemnation, and paid for by public taxation.

The corporation designated by the legislature holds the lands for the people's use, it is true, and the legislature has declared when creating this corporation, for what purpose the land is to be used; but it does not follow as a matter of law, that because the legislature has declared at one time a special purpose for which the land was to be used, the same legislature, or any subsequent legislature, acting for and on behalf of the people, cannot by law, change the use to which the land may be put.

The declaration by the legislature in the act of 1869, that the land was to be used for park purposes for the "rest and recreation of the people, and free forever," cannot be held in law to be a dedication of the property. The definition of a "dedication" as given by Bouvier, is "an appropriation of land to some public use, made by the owner and accepted for such use by or on behalf of the public."

This implies that there must be a giving by one party and an acceptance by the other. A person or corporation, public or private, cannot in the nature of things give to itself. He

or it may devote their property to certain uses, but we are able to discover no law, or precedent, for the position, that a person or corporation, holding title in fee simple to land, and devoting it to a certain use, cannot at any time change that use of its or his own volition.

However desirable it might be, that public lands devoted to park purposes for the rest and recreation of the people in a great city like Chicago, should be forever sacredly devoted to that purpose, the present law and constitution are not effective for that purpose. This desirable consummation can only be attained, in our opinion, by an amendment to the constitution.

It is the province of a court not to make law, but to expound and interpret it. In the absence of constitutional restriction, the legislature of the state is omnipotent.

Counsel for the complainant has not been able to point out to this court any constitutional provision which limits the power of the legislature to control the use of lands, the fee to which belongs to the people; and in the absence of such constitutional restriction, we are forced to conclude that it has such power. Authorities are abundant in support of this position.

In Vol. VII, Am. & Eng. Ency. of Law, 417, the doctrine is stated in the following language:

"When lands held by a municipality for public use, are not subject to any special trust, the legislature may authorize a municipal corporation to sell and dispose of the same or apply them to uses different from those to which they are devoted, but, in the absence of such authority, the municipality has no implied power to do so. If the title to the lands has been acquired by condemnation proceedings, the legislature may authorize a sale thereof, if the fee is vested in the city, although the title of the city may be deemed to have been impressed with a trust to hold the lands for the uses for which they were condemned. If, however, the lands have been dedicated by private individuals for a public park

or square, the legislature has no authority to authorize any diversion from the use to which they were originally dedicated."

In the case of *Brooklyn Park Commissioners v. Armstrong,* 45 N. Y. 234, the city of Brooklyn acquired by the right of *eminent domain,* a certain tract of land for a public park; and the act authorizing the same provided that the title to all the lands should vest *forever in the city.* The city afterwards ordered a conveyance of one lot to the defendant who refused to take the title, alleging that the act of the legislature authorizing the transfer was unconstitutional, and that neither the mayor nor the park commissioners, who held the title for the city, could give a valid title to the fee.

Exactly the same questions were raised as in the case at bar and in passing upon them the court declares: (p. 243.)

"It is to be observed that the act of 1861 vested the lands in the city of Brooklyn *forever, but for the uses and purposes in that act mentioned.* Though the city took the title to the lands by this provision, it took it for the public use as a park, and held it in trust for that purpose. Of course, taking the title, had it taken it also free from such trust, it could have sold and conveyed it away, when and as it chose Receiving the title in trust for an especial public use, it could not convey without the sanction of the legislature; and the act of 1870 expresses the legislative sanction. Under its provisions (Laws of 1870, ch. 373, p. 848), it is authorized to sell and convey, with covenants, certain portions of the lands taken (§ 1), of which the premises in question in this case are a part. *It was within the power of the legislature to relieve the city from the trust to hold it for a use only, and to authorize it to sell and convey.* * * * Where the property is taken, the owner paid its true value, and the title vested in the public, it owns the whole property, and not merely the use; and, though the particular use may be abandoned, the right to the property remains. The property is still held in trust for the public by the authorities.

By legislative sanction it may be sold, be changed in its character from realty to personalty, and the avails be devoted to general or special public purposes.''

In the case of *Clark v. City of Providence*, 16 R. I. 337, 15 Atl. 763, it was held that the general assembly of Rhode Island had the power as against the public to authorize the discontinuance of a public park, the fee of which is in the city, and the sale of the park lands.

In the case of *Mowery v. City of Providence*, 16 R. I. 422, 16 Atl. 511, it was held that a court of chancery had no power to enjoin a city from discontinuing a park and selling the land under an act of the legislature, unless the act conferring the authority was unconstitutional.

In the case of the *Chicago, Rock Island and Pacific Railroad Company v. City of Joliet*, 79 Ill. 25, the supreme court of this state held (p. 33) that where property was dedicated by the owner thereof, as public ground generally, it was an unrestricted dedication to public use, and that the legislature, under such a dedication, had the right to authorize the change of the use by the public from that of a court house yard to railway purposes.

Dillon, in his admirable work on municipal corporations, (4th ed.), sec. 651, lays down the law upon this subject in the following terms:

''As between the municipality and the general public, the legislative power is, in the absence of special constitutional restriction, supreme,—and so it is in all cases where there are no private rights involved. If the municipal corporation holds the full title to the ground for public uses, without restriction, the legislature may doubtless direct and regulate the purposes for which the public may use it. But if a grant be made by a proprietor of a town in laying it out for a specific and limited purpose, as, for example, a 'public square,' the municipality or public acquiring it upon a trust for the uses and purposes set forth on the plat or in the conveyance, it has been decided by the supreme court of Iowa that the grantor in such a case retains an interest there-

in of such a nature that it is not, as against him, within the power of the legislature to authorize its sale by the municipality. * * *''

And in the following section, Dillon lays down the general rule in the following language:

''That while the general rule is that the legislative dominion over the uses of public property is plenary, it is also true, as is more fully shown elsewhere, that there may be rights in the dedicator or in the abutting owner of such a nature,—that is, property rights and rights resting upon contract,—that they cannot be destroyed, and of which he can only be deprived by the exercise of the right of *eminent domain*. * * *''

In the case of *City of Newark v. Stockton*, 44 N. J. Eq. 179, the court, (p. 186) in passing upon the question as to whether or not the city of Newark had a right to divert the use of a certain tract of land, acquired by its inhabitants for burial purposes, declares:

''The general principle of law on the subject is, that municipal property is subject to legislative authority. When property is put in trust in the hands of such a corporation the  effect is to prevent the corporation from perverting, at its own will, such property to other uses; but when the uses are public, and not derived from private grant, they are liable to be modified or changed, with the concurrence of the law-making power.  No case has been found that conflicts with this rule.''

Our own supreme court, in the case of *People v. Walsh*, 96 Ill. 232, has recognized the right of the legislature to control and change the uses of property, the fee of which is held by or for the public.  In that case the right of the South Park commissioners to change the use of one of the streets of the city of Chicago to a boulevard, was called into question by *quo warranto;* and in passing upon the question the court says: (p. 248.)

''The *fee* of the streets here, is, on both sides, stated to be in the city.  That is to say, the city, as the agent or repre-

sentative of the public, holds the fee for the use of the pub-
lic,—not the citizens of the city alone, but the entire public,
of which the legislature is the representative.'' Citing *Chi-
cago v. Rumsey,* 87 Ill. 355.

And on page 250, the court continuing says, that ''The leg-
islature represents the public. So far as concerns the public,
it may authorize one use today and another and different use
tomorrow. If the new use affects private rights, proceedings
for condemnation may have to be invoked, but so far as it
affects the public alone, its representative, in the absence of
constitutional restraint, may do as it pleases.''

It would seem needless to refer to other authorities of the
same import. Indeed the doctrine is recognized in some of
the cases cited by counsel for complainant.

In the case of *Price v. Thompson,* 48 Mo. 361, 364, 365,
cited by him, the court says: ''The park (referring to the
land in controversy) was public property, and whether they
(the town authorities) could divert it from its original use
and the purpose specified by the donor in the act of dedica-
tion, is the question. *The property did not inure, nor was
it acquired by the exercise of the right of eminent domain.*
There is no act of the legislature directing what use shall
be made of the corporate property. * * *'' .

In the case of *People v. Mayor,* 51 Ill. 17, 31, also cited by
counsel for the complainant, the supreme court says:

''It is conceded that municipal corporations, which exist
only for public purposes, are subject at all times to the con-
trol of the legislature creating them, and have, in their fran-
chises, no vested right, and whose powers and privileges the
creating power may alter, modify or abolish at pleasure, as
they are but parts of the machinery employed to carry on
the affairs of the state, over which, and their rights and
effects the state may exercise a general superintendence and
control. * * *''

That the South Park commissioners is such a municipal
corporation has been expressly held by our supreme court in
numerous cases, beginning with the case of *People v. Salo-*

*mon,* 51 Ill. 37, and ending with the *West Chicago Park Commissioners v. McMullen,* 134 Ill. 170.

The conclusion, therefore, seems irresistable. That the legislature of the state of Illinois, in the absence of constitutional restraint, (and none appears) has plenary power to declare, by legislative enactment, to what use the lands in question should be put. In pursuance of that power it has enacted two laws bearing upon the subject:

*First:* The act of February 24th, 1869, (1 Priv. Laws of Ill. 1869, p. 358) in which it declares in section four (4), that the lands in question "shall be held, managed and controlled by them and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall from time to time be adopted by said commissioners and their successors, for the well ordering and government of the same."

But by section thirteen (13) of the same act, they also authorize the said board "to have the full and exclusive power to govern, manage and direct said park; * * * and generally, in regard to said park, they shall possess all the power and authority now by law conferred upon or possessed by the common council of the city of Chicago, in respect to the public squares and places in said city. * * *"

The charter of the city of Chicago, then in force, authorized the city of Chicago to take and hold, purchase, lease and convey such real, personal or mixed estate as the purposes of the corporation may require, within or without the limits aforesaid.

Section one (1) charter of the city of Chicago, approved February 13, 1863, Gary's edition of laws and ordinances of the city of Chicago, 1866.

It would thus appear that in the very act which created the South Park commissioners a corporation, power was given to these commissioners to lease the land in question.

But even if this were not sufficient to authorize the South Park commissioners to pass an ordinance, under the terms

of which they might turn over *Jackson Park* and the *Midway Plaisance* to the *World's Columbian Exposition,* the defendants do not in this case rest the right so to do upon that act. They set up specially in their answers, the act of August 5th, 1890, in and by which (section 3) they are specifically authorized to allow the use of the same, or any part thereof, for the purposes of the World's Columbian Exposition, upon such terms and conditions as may be agreed upon between said South Park commissioners and the authorities having the management of said exposition. And by virtue of this said authority in the act of 1890, the South Park commissioners have, by ordinance, turned over the grounds in question to the World's Columbian Exposition, giving them full and absolute power to take exclusive possession of the same from the first day of October, 1892, until the first day of January, 1894.

By virtue of these acts and of that ordinance, the court is of the opinion that the World's Columbian Exposition is in lawful possession of the property, and had, under the ordinance in question, the right to enclose the property during that period and if it had the right to enclose it, it has the right to charge an admission fee on any days upon which it may be open; and has also the right to foreclose it upon the first, the last, or any other day of the week, during the period mentioned.

This right it need not rest upon the police power, and it does not invoke the same. In the exercise of their judgment as business men controlling a stupendous business undertaking, and acting under the authority conferred upon them by the legislature, and the ordinance of the South Park commissioners, the directors of the World's Columbian Exposition have deemed it for the best interests of the corporation, that it be closed upon Sundays; and in the exercise of that discretion, we are of the opinion, that a court of chancery has no right to interfere.

This court is unanimously of the opinion that there is no religious question involved in this case; and that in the exer-

cise of their sound discretion as business men, in ordering the gates closed on Sunday, the directors of that company have not and do not discriminate between any classes of religious people.   Whether we are or are not a Christian nation is not the question in issue in this case.

If they had decided to keep the gates of the exposition grounds open every day of the week, it would have been their right so to do; and in that event there would have been no more ground for the interference of a court of chancery than there is at the present time.

We are, therefore, of the opinion, that the injunction in this case should be dissolved, and are of the opinion that if the issues presented to this court en banc and heretofore discussed by us had been submitted to the able and learned chancellor who issued the temporary injunction herein, he would not have granted the same.

The motion to dissolve the injunction in this cause is sustained.

Judge Goggin in his dissenting opinion said:

The principal question presented in this case is whether the World's Columbian Exposition by virtue of its agreement with the South Park Commissioners obtained lawful control over the park grounds and acquired the power to enclose the same with a fence and exclude the public therefrom on the first day of the week commonly called Sunday.   It is claimed by the defendants that the South Park Commissioners have the right to confer such control and power for two reasons: First, because they were authorized so to do by section 3 of the act of August 5, 1890, and second, because of the general powers conferred upon them by the act of February 24, 1869. It is plain, however, that the position assumed by the defendants is not tenable.

First.   Section 3 of the act of August 5, 1890 is as follows:

"Sec. 3.   In   case the site or sites for the holding of the said World's Columbian Exposition, as finally located and fixed by the authorities in charge thereof, shall include the

whole or any part of any public park which is or may be under the control and management of park commissioners, then and in that event it shall be competent and express authority for that purpose is hereby granted to the park commissioners having the control and management of such public park to allow the use of the same or any part thereof for the purposes of said World's Columbian Exposition upon such terms and conditions as may be agreed upon between the said park commissioners and the authorities having the management of said exposition.''

It cannot be doubted that, if this statute is valid, its terms are broad enough to confer the right thus claimed. But it is very plain that the act referred to, so far as the section quoted is concerned, is invalid.

Section 22 of Article 4 of the Constitution of 1870, provides that the General Assembly shall not pass local or special laws in any of certain enumerated cases, among which is a local or special law for ''granting to any corporation, association, or individual, any special or exclusive privilege, immunity or franchise whatever.''

By reference to the act in question it will be observed that it does not purport to authorize the park commissioners to allow the use of park property to exposition companies or associations generally. The sole power given is to allow the use of park property to the authorities of the World's Columbian Exposition, a particuler corporation or association. That the right to take possession of and use park property for the purpose of conducting an exposition or any other enterprise of a private corporation is a ''privilege'' within the meaning of the constitution is too plain to admit of dispute. The act in question is, therefore, plainly one granting to a particular corporation or association a special privilege not granted to other corporations or associations, and unconstitutional.

This position is not rendered any the less tenable by the fact that the act in question does not directly grant to the exposition authorities the privilege of taking possession of and using park property, but simply authorized the park

commissioners to grant the privilege. The right given by the act to the exposition authorities to obtain by contract the right to use park property and to reap the benefits of such contract would itself be a "privilege" within the meaning of the constitution. Apart from this, it is evident that what the constitution forbids the Legislature to do directly, it cannot be permitted to accomplish by indirection. Being forbidden to itself confer by special law a special privilege upon any corporation, association or individual, it cannot defeat the purpose of the constitution by authorizing its agents to confer that privilege.

But even were the act in question not in contravention of the constitutional provision above referred to, it would still be invalid for another reason. While it may be true, as a general rule, that the legislature has such power over municipal corporations that it may direct land purchased for park purposes to be diverted to other uses, yet that power can only be lawfully exercised in accordance with the limitations imposed upon the legislature by the constitution.. Upon consideration of the various provisions of the constitution, it will be found that it contains no warrant for an act of the legislature which purports to authorize a municipal corporation to surrender control of park lands to a private corporation for the purpose of carrying on a private business or enterprise.

That the legislature has no power under the constitution to grant to corporate authorities the right of taxation for any other than corporate purposes is well settled:   Constitution of 1848, sec. 5, Art. 9; Constitution of 1870, secs. 1, 9 and 10, Art. 9; *Harvard v. St. Clair, etc., Drainage Co.,* 51 Ill. 130; *Board of Trustees of Schools, etc., v. People ex rel. Toledo, etc. Ry. Co.,* 63 Ill. 229; *Sleight v. The People, etc., for use of Weller Township,* 74 Ill. 47; *People ex rel. Cairo & St. Louis Ry. Co. v. Dupuyt,* 71 Ill. 651; *People ex rel. Cairo & St. Louis R. R. Co. v. Trustees of Schools,* 78 Ill. 136; *Board of Supervisors of Livingston Co. v. Weider,* 64 Ill. 427.

It is plain, therefore, that if the legislature had authorized

the South Park Commissioners to levy taxes for the purpose of purchasing land and had declared that the land thus purchased should be turned over to the World's Columbian Exposition authorities to be used in the manner in and for the purpose for which it is now being used, no one would have the hardihood to contend that such an act of the legislature would have any validity.    Taxation by any municipal corporation for the purpose of raising money to aid a private corporation in carrying on a show or exhibition to which the public are admitted only upon paying an admission fee, which fee is to belong to such corporation, is clearly taxation for a purpose not corporate.  *Livingston Co. v. Weider,* 64 Ill. 427; *People v. Dupuyt,* 71 Ill. 651; *People v. Trustees,* 78 Ill. 136.

In *People v. Trustees,* 78 Ill. 136, the question arose whether the legislature could, under the Constitution of 1848, authorize the trustees of schools of a township to subscribe for the capital stock of a railroad company and levy taxes to pay for the same.  The court in deciding the case said:

"It is urged by appellees, that Art. IX, Sec. 5, of that Constitution, prohibited the general assembly from conferring that power on such a body; that the creation of such a debt, and the levy of such a tax, is not for a corporate purpose.    That section provides that 'the corporate authorities of counties, townships, school districts, cities, towns and villages may be invested with power to assess and collect taxes for corporate purposes.'    This clause was manifestly intended to limit the legislative power in conferring authority on corporate bodies as assess and collect taxes."

Without any provision in the constitution on the subject, the general assembly have the power to impose taxes as they may choose.   They could impose a tax on one species of property, and exempt another.  They could fix the mode of ascertaining and the manner of its imposition as they might choose, if the power was not limited, and the mode prescribed in the fundamental law.   This was, then, most clearly a limitation of legislative power.

Had this restriction not been imposed, the general assem-

bly could have empowered any of these quasi corporations or municipalities to levy and collect taxes for any purpose, whether germane to the object of its organization, or for other purposes. They could have authorized a school district to levy and collect a tax to build a court house, a jail, bridge, or other county object; or a school township or district to erect a poor house and maintain the paupers of the county.

These school townships were created and are continued for school purposes alone, and not for municipal purposes. They are only intended to establish schools, and loan and manage the school fund of the township, and pay the teachers of schools taught in their jurisdiction. This is the purpose of their organization. They were not created to exercise any of the functions of government, and hence are not municipal in their nature or purpose, nor are they provided with the officers or the power to exercise the functions of government. Cities, towns and villages are endowed with such powers and are created and maintained for their exercise. Their very object is to aid in the government of the people. And such is true, in a more limited sense, of counties. But none of these functions are conferred upon school townships or districts, but their creation is purely to aid in the great scheme of accomplishing universal education.

The body of men who framed the constitution must be supposed to have known the meaning of the language employed, and they must have believed that it would be understood in its ordinary sense, and they must have supposed it would receive a reasonable interpretation and a practical application in the administration of government. When, therefore, they used the language 'for corporate purposes,' they supposed that, if any question arose in the construction of this clause, the legislative, executive or judicial department of the state, which was required to apply its principles, would look and see what was the object of the creation of the body, and limit it to that purpose. They did not, on the one hand, expect that there would be an effort to push the construction to the extent that it would embrace all purposes which might, by possibility, be

brought in the corporate power. Nor yet, on the other hand, to so contract and narrow the construction as to exclude purposes that are embraced in their charters, but which may not be strictly germane to corporations of that character; but that it would be held to authorize the exercise of the power, when the body is created for specified public purposes, although of a mixed character; as, if these school townships had been empowered, in addition to the duties imposed upon them, to locate, open and maintain roads in the limits of their territory, then they could have been empowered to levy a tax for the maintenance of roads, as that would have been a corporate purpose.

But school townships are not invested with such powers over roads, and hence they cannot be invested with authority to assess and collect a road tax, nor can they be until one of the purposes of its existence shall be to repair the roads in the township. To give any other construction would be to abrogate and wholly disregard this provision. To say that because the general assembly confers the power to levy a tax for any purpose, the law of the organization for such body is thereby changed, and the tax is for a corporate purpose, would be to render this restriction wholly nugatory. We fail to comprehend the force of such reasoning, and we must give some effect to this constitutional provision. Although that constitution has ceased to be a rule for the guidance of the departments of government, still all laws adopted whilst in force, and all rights acquired under it, must be tried by and enforced as though it was in full vigor.

Had the construction contended for by appellant been what was intended, why not have simply said that these bodies might be invested with power to 'assess and collect taxes?' Or why insert any provision on the subject and let the power of the general assembly remain unrestricted? That strikes us as the more natural and reasonable course that would have been pursued. Tested by these rules, the subscription by a school township or school district for the stock in a railroad company or the levy of a tax to raise the money to

pay for the same, cannot be held to be a corporate purpose. Such a tax in nowise aids or promotes education, for which such bodies are created. And this is the construction given to this clause in the cases of *Trustees of Schools, etc., v. Toledo, Wabash and Western Railway Company*, 63 Ill, 299, and *People ex rel. v. Dupuyt*, 71 Ill. 651, when the same question was before the court as is presented by this record.''

In view of what is thus said by the court in the case cited, it is plain there can be no sound foundation for the contention that the holding of an exposition or other exhibition under the control of a private corporation involving the fencing up of park property and the exclusion of the public therefrom, excepting upon the payment of an admission fee, is a ''corporate'' purpose of park commissioners such as the South Park Commissioners, who are organized as a corporation for the purpose of acquiring lands to be ''held, managed and controlled by them and their successors as a public park, for the recreation, health and benefit of the public, and free to all persons forever.'' It is, on the contrary, a purpose in direct conflict with the object for which the corporation known as the South Park Commissioners was brought into being. Hence a legislative act authorizing a tax to be levied for the benefit of such an exposition or exhibition would be unconstitutional and void.

If, then, the legislature has no power to authorize park commissioners to levy taxes for the purpose of purchasing property to be donated or turned over to a private corporation to be used by it for a purpose not corporate, it follows necessarily that it cannot direct that land already purchased by money raised by taxation for corporate purposes shall be thus donated or turned over. To permit such a power to be exercised would allow that to be done indirectly which cannot be done directly.

It is manifest, therefore, that the inhibition of the constitution against acts of the legislature purporting to confer upon municipal corporations the power to levy taxes for purposes not corporate, carries with it necessarily a like inhibition

against any legislative act permitting money or property obtained from the people by taxation to be diverted to a purpose not corporate.

The act referred to for both the reasons suggested is, therefore, unconstitutional and void.

Second. The act of February 24, 1869, declares that the park lands, "shall be held, managed and controlled by them (i. e., the park commissioners) and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations as shall, from time to time, be accepted by said commissioners and their successors for the well ordering and government of the same;" and it further provides that they shall "have full and exclusive power to govern, manage and direct said park * * * and, generally, in regard to said park they shall possess all the power and authority now by the law conferred upon or possessed by the common council of the city of Chicago in respect to public squares and places in said city." As the charter of the city of Chicago then in force authorized it to take hold, purchase, lease and convey such real estate as the purposes of the corporation may require, it is claimed, as a sequence, that the park commissioners had the power to lease the park land to the authorities of the World's Columbian Exposition.

If the park commissioners had purchased land for park or other corporate purposes which they could use for such lawful purpose and at the same time increase their revenues by such partial leasing of the same as would not interfere with its use for the corporate purpose for which it was intended, it is probable that such partial leasing might be tolerated, upon the same principle that a corporation having had power to hold so much real estate as may be necessary for the transaction of its business, and becoming the owner of a larger building than it needs, may lawfully lease the portion thereof which it does not need.

But such is not this case. Here the land turned over to the exposition authorities was not land not needed by the park commissioners for the corporate purposes, but land included

in a park which, at the time it was thus turned over, was in use as such and open to the public. Its turning over, further-more, involved to a large extent, the destruction of its trees and other ornaments which enhanced its usefulness as a public park "for the recreation, health and benefit of the public."

Again, so much of the act last referred to as purports to confer upon the park commissioners "all the power and au-thority now by the law conferred upon or possessed by the common council of the city of Chicago in respect to public squares and places in said city," must be so construed as to be consistent with the other parts of the act. To lease a public park to a private corporation is manifestly inconsistent with its being "held, managed and controlled   *   *   *   as a pub-lic park for the recreation, health and benefit of the public and free to all persons forever." The power and authority to be exercised by the park commissioners, therefore, is such power and authority as is consistent with the holding and managing of the property "as a public park for the recreation, health and benefit of the public and free to all persons for-ever." It is a self-evident propositiion that property cannot be "held, managed and controlled   *   *   *   as a public park for the recreation, health and benefit of the public and free to all persons forever," and at the same time be leased to a private corporation with power to exclude the public thereform.

Apart from this it is clear that even the city council of the city of Chicago would have no power, by a lease or otherwise, to divert a public square or other place to a use that was not corporate. The evident meaning of the legislature, by giving park commissioners "all the power and authority now by law conferred upon or possessed by the common council of the city of Chicago in respect to public squares and places in said city," was not to give them power to lease such property to private individuals for noncorporate purposes, but simply to authorize them to exercise the same general power, super-vision and control as is generally exercised by the corporate authorities of cities over similar property.

Finally, what is above said, with respect to the act of

August 5, 1890, is in part equally applicable to the attempt to
construe the law of February 24, 1869, as giving the park
commissioners power to lease the park lands to the exposition
authorities. The park commissioners, having no power to
levy taxes for other than corporate purposes, are not author-
ized, after having levied taxes and purchased property with
the money collected, to divert that property to a non-corpor-
ate purpose and thus do indirectly what the constitution for-
bids to be done directly.

I am, therefore, clearly of the opinion that the action of the
South Park Commissioners in turning the park lands over to
the authorities of the World's Columbian Exposition was
without sanction of law and that it was flagrant disregard of
the constitution of this state. Being of that opinion I cannot
permit myself to enter an order in this case giving to such
action judicial sanction.

The point is made that this suit can not be maintained in
the name of the complainant, but that only the attorney-gen-
eral can maintain such a bill. I do not regard the authorities
cited by counsel for defendants as sustaining their position.
However this may be, in the absence of a decision of the su-
preme court of this state directly in point, I am not willing
to lay down a rule by which the success of a private corpora-
tion in seizing upon and holding a public park and excluding
the public therefrom will be made to depend solely upon the
whim, caprice, dishonesty or ignorance of the individual who
may for the time being happen to fill the office of attorney-
general. But this suit though not instituted in the name of
the attorney-general, has his express sanction, and this I re-
gard as, in any event, sufficient.

The complainant, therefore, would, in my opinion be en-
titled to an injunction restraining the authorities of the
World's Columbian Exposition from excluding him from the
park land on any day or from demanding from him the pay-
ment of an admission fee at any time. All he has asked, how-
ever, is, in effect, that the exposition authorities be enjoined
from excluding the public from the park grounds on Sunday,

and that is all the court granted. The fact that he asks for less than he is entitled to can not be successfully urged by the defendants as a reason for refusing him any relief at all. It would be an unheard of proceeding to deny a complainant any relief, because his rights were more extensive than those which he chose to assert.

The motion to dissolve the injunction must, therefore, be denied.