## STATE EX REL. v. YOUNG, EXECUTOR
(No. 1714; January 25, 1932; 7 Pac. (2d) 216)

For the appellant there was a brief by *James A. Green-
wood*, Attorney General, and *R. J. Jackson*, Deputy Attor-
ney General, both of Cheyenne, Wyoming and oral argu-
ment by *Mr. Jackson*.

8

For the respondent there was a brief and arguments by *C. E. Winter* and *P. E. Winter*, of Casper, Wyoming.

BLUME, Justice.

This case relates to the inheritance taxes payable by the estate of Frank G. Curtis. The decedent died testate on March 16, 1922, leaving his widow and a number of other persons as beneficiaries under his will. In December, 1923, a so-called compromise agreement was entered into between the executors of the estate on the one hand and the inheri-

tance tax commissioner with the approval of the attorney general of this state on the other, purporting to be made in accordance with Sec. 34, Ch. 126, Session Laws of 1921, which provides that whenever an estate from which an inheritance tax is due is of such a nature or so disposed that the value thereof cannot with reasonable certainty be ascertained under the provisions of the law, the inheritance tax commissioner may with the approval of the attorney general compromise with the beneficiaries or representatives of such estates and compound the taxes thereon, the settlement to be approved by the District Court having jurisdiction of the estate. According to this settlement, the assets of the estate were valued at approximately $1,783,-000, with deductible expenses of about $687,604, making the tax due the state $28,151.56, and an additional sum, if it should thereafter be found that 25,300 shares of the New York Oil Company stock which had been transferred to Mrs. Curtis within six months prior to the death of the decedent, should be held to be taxable under the laws of this state. This settlement was approved by the District Court, and it was ordered and adjudged that the inheritance tax due should be the amount as above specified. The sum of $10,000 of the tax was paid subsequently, in July, 1926. Nothing further was done in the matter until the fall of 1927. At that time the executor of the estate wanted a further deduction of approximately $421,000 by reason of the payment of that sum to the government of the United States on account of income tax due for the year 1919. On September 13, 1927, the inheritance tax commissioner made a new computation of the amount due, adding to the taxable property the sum of $253,000 on account of the New York Oil Company stock transferred to Mrs. Curtis as above mentioned, and allowing the foregoing sum of $421,-000 as a deduction, in addition to the deduction that had been allowed under the compromise agreement of 1923, leaving the inheritance tax then due in the sum of $24,-328.21. This amount not having been paid, an action was

brought in the name of the State by William O. Wilson, then Attorney General, on March 13, 1928, setting forth in the first cause of action, in general terms, the amount due from the Curtis estate as an inheritance tax and claiming judgment therefor, and setting forth in the second cause of action the compromise agreement of 1923 and asking judgment therefor and the enforcement thereof. Subsequently and on March 19, 1928, the attorneys for the Curtis estate and the Attorney General, with the approval of the inheritance tax commissioner, entered into a stipulation, reading, in part, as follows:

"That full compromise settlement of all matters in question between the State Inheritance Tax Department of Wyoming and the said Estate has this day been made as follows:

Said estate had paid over to said Department the sum of $19,473.02 in full payment of the tax agreed upon between the parties as covering all items and claims upon and against said Estate * * *

In consideration of the foregoing and on behalf of said Department, it is hereby agreed forthwith to dismiss the action, No. 6905, now pending in the District Court of Natrona County, Wyoming, in which the State of Wyoming ex rel. William O. Wilson, Attorney General, is plaintiff, and Minal E. Young, Executor of the Estate of Frank G. Curtis, deceased, is defendant; and forthwith to execute and deliver to said Minal E. Young, Executor, the necessary waiver by the State of Wyoming of all claims and demands of every nature on its part upon and against said Estate, and any of its properties, and especially upon the New York Oil Company stock belonging to said Estate."

The further sum of $3481.38 was paid to the Inheritance Tax Commissioner, to be held in escrow until it should be determined whether or not a bequest of $50,000 to the Christian Science Church of Jamestown, New York, was taxable under the laws of this state. This amount, as we understand it, has since that time become the absolute property of the State, and the amount of inheritance tax, accordingly, paid herein is the sum of $32,954.40. On the

12

26th day of February, 1930, an order of dismissal was entered in the case last above mentioned, as follows:

"The above entitled cause coming on regularly for hearing on the stipulation of the parties and the court being fully advised in the premises, it is ordered that the said cause be and the same is hereby dismissed."

In a previous order made in the same case the court recited that it had examined the petition in the cause and the stipulation filed in respect thereto. At the time of the deduction of $421,000 made as above mentioned, the question arose as to whether or not any part of that sum would be repaid by the Government of the United States. The executor of the estate testified that he told the deputy inheritance tax commissioner, who had this matter in charge, that he had paid that sum under protest and hoped to recover all or a part thereof. According to the testimony of the deputy inheritance tax commissioner, the matter was discussed and under consideration, but he disclaimed any knowledge of the fact that the payment had been made under protest. Subsequently the sum of about $189,000 of the amount so paid was recovered from, and repaid by, the United States, and the then inheritance tax commissioner claimed an additional tax of $4264.25 on this sum by notice sent to the executor of the estate on April 19, 1930. The executors refused to pay it, claiming that by reason of the settlement made in 1928 nothing more was due. Thereupon, the present action was commenced in the District Court of Natrona County in which again the compromise agreement of 1923 was sought to be enforced, but the state asked, as an alternative thereof, that an additional tax of $4264.25 be assessed on the sum of $189,000 repaid by the government of the United States as above mentioned. Issues were duly joined in the case, the defendants, among other defenses, relying on the settlement made in March, 1928, and claiming additional deductions by reason of further attorney fees and executor's fees paid out by the estate

and not theretofore deducted in computing the inheritance tax due the state. The case was tried on the theory whether or not an additional tax was due on the above mentioned sum of $189,000, and the enforcement of the compromise agreement of 1923 was waived or not insisted upon. The court entered judgment holding the sum of $189,000 above mentioned taxable, but allowing a deduction against it in the sum of approximately $177,000 and giving judgment in favor of the state for $238.95. From this judgment the state has appealed to this court, again claiming that the compromise agreement of 1923 should be enforced and that alternatively an additional tax should be assessed on the sum of $189,000 above mentioned without any deductions therefrom. The estate of Curtis has not appealed.

The state claims that the compromise agreement of 1923, approved by the court, is absolutely binding upon the Curtis estate, and that the court had no power to interfere therewith, or permit evidence in this case showing that additional deductions were subsequently allowed and that a new agreement or compromise, impliedly approved by the court, was subsequently made. It is undoubtedly true that the order entered by the court upon the compromise agreement of 1923 was a judgment fixing the amount of tax due to the state. The attorney general was apparently of the opinion, in March, 1928, that it was necessary to commence a civil action in order to recover the amount then due. Section 31 of Ch. 126, Session Laws 1921, provides that whenever it shall appear that any tax is due to the state under the provisions of the Act, the attorney general, in the name of the state, shall sue for and enforce the collection thereof, appearing for and representing the inheritance tax commissioner of the state. Section 9 of the Act provides:

"that in all estates * * * all inheritance taxes shall be sued for within five years after they have become due and legally demandable, otherwise they shall be conclusively presumed to be paid and cease to be a lien against the estate, or any part thereof, of the decedent."

Section 6 of the same act provides that the inheritance tax due from a decedent's estate shall be due and payable at the expiration of one year from death. So that when the action of March, 1928, was brought, nearly five years had elapsed since the tax due from the Curtis estate was payable. The attorney general evidently believed that unless suit was instituted at that time, the state would be barred from recovering any further tax from the estate. The inheritance tax law has been changed by an act of the legislature of 1925 (Laws 1925, c. 78), making inheritance taxes assessable by the inheritance tax commissioner, and we need not determine what is necessary to be done under that Act, but under the law of 1921 the court determined and fixed the amount of the inheritance tax due from any estate and we think, accordingly, that when a judgment was rendered by the court in the matter of the estate, fixing and determining and adjudging the amount due as inheritance taxes, that constituted a judgment, making an action in the District Court unnecessary unless, possibly, that judgment had become dormant, which was not true. Dietemann v. People, 76 Colo. 378, 232 Pac. 676. Still, the attorney general had the right to bring the action of 1928, and the court had jurisdiction to entertain it, for an action may be brought to enforce a judgment. It is said in 34 C. J. 1080:

"At common law and generally, except in so far as the right has been restricted by local statutes, a judgment for a sum certain in money is a debt of record, and as such may be made the foundation of a new action. * * * the weight of authority is to the effect that no reason for bringing the suit, other than that the judgment remains unpaid, need be alleged, that the right to maintain an action on a judgment is not dependent upon the right to issue an execution thereon, and that the action is maintainable notwithstanding the right to issue execution on the original judgment remains unimpaired, such right being merely a cumulative remedy."

In Headley v. Roby, 6 Oh. 521, 523, it is said:

"It is one of the first principles we learn in relation to the action of debt, that it may be sustained on a record of a judgment, and when the judgment is obtained, and the record made up, the right of action is complete. It may be brought not only on the judgments of our own courts, but those of our sister states. The right to issue execution on a judgment is a remedy cumulatory only; and I know of no law which would deny to the party a right of action on a judgment, if he chose that remedy, because he could issue an execution."

In the case of Fletcher v. Hickman, (C. C. A.) 165 Fed. 403, 404, the court said:

"The right to enforce payment of a judgment by process of execution is merely cumulative. The obligation of the judgment debtor is to pay the judgment when rendered. If he fails to perform the obligation, no reason is perceived why the judgment creditor may not resort to the courts of the land to enforce it. If the judgment debtor desired to escape the vexation and annoyance of successive suits, it is pertinent to suggest that he had it in his power to do so, and at the same time save his creditor from greater vexation and annoyance, by discharging his obligation and paying his debt when due."

In the case at bar, the action brought by the attorney general in 1928 was compromised and settled as above mentioned, and a judgment of dismissal was entered pursuant to the settlement. The rule seems to be universal that a judgment of dismissal entered by agreement of the parties pursuant to a compromise and settlement of the controversy is a judgment on the merits barring any other action for the same cause. 34 C. J. 787; 3 Freeman on Judgments (5th Ed.) p. 1596. And the state, when invoking and consenting to the jurisdiction of the courts, is just as conclusively bound by the judgment that may be rendered in the case as a private individual. 34 C. J. 1039. If, accordingly, the attorney general of the state in conjunction with

the inheritance tax commissioner had the right to compromise and settle the action of 1928, a point which we shall discuss hereafter, it is clear that the state was bound by the judgment of dismissal and bound by the settlement which released the Curtis estate from all further liability from any inheritance taxes. If there was any fraud or mistake, the settlement and the judgment of dismissal pursuant thereto might, probably, be reopened, but no fraud or mistake is claimed. In fact the point as to whether or not any amount of the $421,000 heretofore mentioned would not be repaid by the government of the United States was discussed at the time of the settlement. The sum of $189,000 subsequently repaid was not newly discovered property. The right to that sum existed, theoretically at least, at all times, although it had not been repaid. Just what items were taken into consideration in making the settlement of March, 1928, is not altogether clear, but in any event, all should have been considered, including any amount that might subsequently be repaid by the government of the United States, particularly when the possibility of repayment was contemplated by or known to the parties.

There were two compromises herein, and two compromise-judgments. If any mistake was made herein—and we do not say that there was—it was made by the officers of the state, who did not stand upon the first. The differences between the compromise judgments herein is that the later one was made pursuant to a settlement of a suit, the earlier was not. The power given pursuant to Section 34, Ch. 126, of the laws of 1921, above mentioned, was, perhaps, exhausted when the compromise of 1925 was made, so that we should proceed to determine whether or not the attorney general, with the approval of the inheritance tax commissioner, had the power to make a settlement in March, 1928, independent of any statute, so as to make the judgment of dismissal pursuant thereto binding, for the rule above mentioned, that a judgment entered pursuant to a compromise and settlement is a bar to any further action, contemplates

and presupposes that the compromise is one that is validly entered into. And while the rule pervails in England that an attorney has power by virtue of his retainer to compromise an action (6 C. J. 662), the general rule in the United States is the other way. 6 C. J. 659. If, then, the attorney general acted merely in the capacity of an attorney when the later compromise was made, the judgment pursuant thereto would, probably, not be binding upon the state. So let us consider his powers, and the nature thereof, more in detail. Under the statutes of this state (Sec. 31, Ch. 126, Laws of 1921), he is given the power, and it is his duty, to represent the inheritance tax commissioner in any litigation. When he does so he is a representative of the state, and when he acts with the approval of the inheritance tax commissioner, as he did in the case at bar, the state is represented by the only parties who have power to represent it in such matter. It has been held in Follmer v. State, 94 Neb. 217, 142 N. W. 908, Ann. Cas. 1914 D 151, that the attorney general acts, in some matters at least, in an executive capacity, and that would seem to be the capacity, or at least partially, in which he, with the approval of the inheritance tax commissioner, acted in the action of 1928. In some matters, and possibly partially in a case of the character now considered, he doubtless acts in a judicial capacity, as was said in People v. Peabody, 22 Barb. (N. Y.) 114, where the court, in a case brought on behalf of the people, observed:

"His office is a public trust. It is a legal presumption that he will do his duty; that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern. The exercise of such discretion is, in its nature, a judicial act, from which there is no appeal, and over which courts have no control."

In the case of People v. Manufacturing Company, 42 How. Pr. (N. Y.) 162, the attorney general of the state

directed a discontinuance of an action to forfeit the charter of a corporation, which was granted. A motion was thereupon made to vacate the discontinuance. The motion was denied, the court saying:

"The people, in their sovereign capacity, are the only ones who can claim the forfeiture of the charter of a corporation. That is too well settled to need authority. They may claim the forfeiture or waive it, and they may waive it at one time or at another, either before or at any stage of a proceeding to enforce it. That being clearly so, their Attorney General, in the absence of any expressed other will of the legislature, acting as the representative of the people, may of course act for them, and exercise complete control of the question how far the forfeiture shall be insisted upon, and when he thinks that the public interests require that he should prosecute it no further, and make no claim by reason of the forfeiture, he may, as he did here, discontinue the suit and end the same."

In the case of People v. Finch, et al., 207 App. Div. 76, 202 N. Y. S. 582, 584, there was a controversy in regard to land claimed by the state, and an action was brought in 1908 to compel the defendant to convey it, but this action was compromised by the attorney general of the state by accepting a deed for the land, but with valuable reservations in favor of the defendant. It was claimed that the agreement as to such reservations was invalid. The court said, however:

"There was power in the Attorney General to make a settlement of the suit of 1908. If he did not possess such power under Section 62 of the Executive Law, he certainly possessed it under the common law. People v. Miner, 2 Lans. 396; People v. Brennan, 69 Misc. Rep. 548, 127 N. Y. Supp. 958; People v. Tobacco Mfg. Co., 42 How. Prac. (N. Y.) 162; Follmer v. State, 94 Nebr. 217, 142 N. W. 908, Ann. Cas. 1914 D, 155. The settlement was made in the belief that the state did not own the lands. The settlement under such circumstances was constitutional. When the state settled and accepted the deed, it did so upon the recognition of the validity of the title of the defendants.

This was not an unauthorized act. Not owning the lands and representing the state, the Attorney General was in a position to estop the state from afterwards claiming to the contrary. It is only the unauthorized acts of the officers of the state that fail to operate as an estoppel.'' (citing cases.)

In the case of People v. Stephens, 52 N. Y. 306, the attorney general on behalf of the people brought an action to set aside a canal repair contract, evidently made with the state, on the ground of fraud. The state was defeated in the action and the attorney general agreed, in consideration of certain things to be done by defendant, not to prosecute an appeal. The court, in speaking of the power of the attorney general to make that agreement, said as follows:

''The act, under which this action was brought authorizes the attorney general to bring and maintain such actions as he may deem advisable for the purposes mentioned in the act; he was thus vested with full discretion to determine whether or not to bring or maintain the action. No other officer of the State was intrusted with any power in respect to it. Under these circumstances, after a decision in the action adverse to the State, the attorney general had the right and power to determine whether to acquiesce in such decision or to appeal. Having determined to acquiesce, if by entering into a stipulation to proceed no further he could procure from the adverse party a waiver of all claim for costs, and thus save expense to the State, such an arrangement, if made in good faith, should be sustained.''

In the case of People ex rel. v. Spring Lake Drainage District, 253 Ill. 479, 97 N. E. 1042, 1052, the question arose whether or not the attorney general had power to enter into a stipulation to dismiss a case, and the court said:

''Appellees contend that the stipulation was one that the Attorney General had not power to enter into. Upon this branch of the case but little need be said. The Attorney General, under the law, is the sole representative of the people and the canal commissioners and has the power to file informations such as the one filed against appellees, and has power, both under the common law and under the stat-

ute, to make any disposition of such causes that he deems best to the interest of the State. * * * No serious question can be raised in respect to the power of the Attorney General to dismiss a suit brought by him, either with or without any stipulation, upon behalf of the opposite party.''

In 6 C. J. 814, 815, it is said:

''In the absence of explicit legislative expression to the contrary, the attorney general possesses entire dominion over every suit instituted by him in his official capacity whether there is a relator or not. As an incident of such control, the attorney general has power to dismiss or to discontinue suits brought by him, either with or without a stipulation by the other party, and to make any disposition of such suits that he deems best for the interest of the state.''

On the other hand, we have the case of Commonwealth v. Humston, 9 Ky. Op. 525. In that case the state had procured a judgment for a certain sum of money and the attorney for the commonwealth thereafter agreed to submit to arbitration the amount equitably due from the defendant. And the arbitrators found that there was due much less than the judgment originally recovered. It was held that the attorney for the commonwealth had no power to compromise the claim or agree that it might be submitted to arbitration.

The rule fairly deducible from these authorities would seem to be that the attorney general has power to settle and compromise a suit, when the rights of the state are in doubt and are in honest dispute, at least when he acts with the approval of the executive head of the department which may, in any case, have the matter involved in the suit in his particular charge. On the other hand, it may well be that the rule stated in the Kentucky case just cited should be applied in a case where the rights of the state cannot in any way be said to have been in doubt. Our attention is called to Sec. 40, Art. III, of our constitution, which reads as follows:

"No obligation or liability of any person, association, or corporation held or owned by the state, or any municipal corporation therein shall ever be changed, transferred, remitted, released or postponed, or in any way diminished by the legislature, nor shall such liability or obligation be extinguished except by the payment thereof into the proper treasury."

And it is claimed that if the judgment of 1923 is in any way interfered with, this constitutional provision is violated. A similar constitutional provision was construed by the Supreme Court of Illinois in the case of Burr v. Carbondale, 76 Ill. 455, 474 (see 36 Cyc. 171). It appears in that case that the state became the owner of $100,000 of bonds issued by the city of Carbondale. The legislature passed a resolution authorizing the governor to sell them for $30,000.00 and it was argued that this was in violation of the constitutional provision above mentioned. But the court held that this provision was not intended "to embrace a release of claims doubtful and hazardous." That decision goes too far, perhaps, and we are not at this time prepared to follow it to its full extent, but it indicates, nevertheless, the rule that should be applied in this case. Before it can be said that any part of a liability or obligation has been released, the amount thereof must be known, and while it may be said, perhaps, at first glance, that nothing could be more definite than the judgment of 1923, still it was sued upon, the court had jurisdiction of the action, the judgment was open to controversy and to all legal defenses, and the liability and obligation to the state could not, accordingly, be said to be definite, certain, and beyond doubt until the court had determined it in that case. The only determination made by the court in that case was to dismiss the action pursuant to a compromise, impliedly approving it. Of course, the constitutional provision above quoted should not be circumvented by indirect means, and not every compromise can be upheld. A person cannot create a dispute sufficient as a consideration of a com-

promise by a mere refusal to pay an undisputed claim. That would be extortion and not a compromise. There must in fact be a dispute or doubt as to the rights of the parties honestly entertained. Demars v. Musser-Sauntry Land etc., 37 Minn. 418, 419, 35 N. W. 1; McGlynn v. Scott, 4 N. D. 18, 24, 58 N. W. 460; 12 C. J. 324, 332. There is nothing in the case at bar to show that both parties were not in good faith in their respective claims. The contrary is indicated by the record. Several meetings were had, it seems, in which the liability of the Curtis estate for inheritance taxes was discussed. Just what items, aside from the $421,-000, were considered does not appear. But the situation suggests a number of facts as well as matters of law which may have been in the mind of the parties. The compromise judgment of 1923 is specific in pointing out the items of property valued, and the items of deduction allowed. The estate tax subsequently paid to the Federal Government in the sum of $80,000 does not appear therein, and yet that was a deductible item. In Re Young's estate, 33 Wyo. 317, 239 Pac. 286, 289. Again the widow of the decedent received a family allowance of, it seems, about $38,000, and that amount, too, if not too high, has been held to be a deductible item. Ross on Inheritance Taxation, Sec. 60. There may have been a number of items omitted by mistake, that should have been deducted, for the total expenditures of the estate are reported as more than a million and a half dollars, aside from additional attorneys' fees and executors' fees, much, at least, of which appears to have accrued by reason of unforseen circumstances arising in the estate, and at least $59,000 of which was paid out in connection with the recovery of the very $189,000 involved in this case. The legal phases connected with these matters had never been authoritatively settled by this court. Freeman holds that in a suit on a judgment the same matters may be set up in defense, which would be sufficient as grounds to obtain equitable relief therefrom or to open up a judgment

on a motion. Freeman on Judgments, (5th Ed.) Section 1073 and 1246. And the parties were confronted with a number of New York decisions and other authorities holding that a surrogate court may modify an order fixing the inheritance tax, when certain items have been overlooked. In Ross, supra, Sec. 292, the author says:

"If property, through collusion, concealment, or inadventure, or inadvertence, has escaped assessment, the surrogate court is not without power to reach it; and if facts come to light after the tax has been assessed, showing that the court has exceeded its jurisdiction, imposed a tax on a succession that did not take place, or has otherwise been led into error calling for a modification of its orders or decrees, the court has authority to grant relief. The surrogate is clothed with authority to modify his decree erroneously imposing a tax. He may modify his order holding that a transfer or succession occurred which in fact did not. He may modify his decree so as to allow an exemption, or to deduct a debt of the estate that has been overlooked, or deduct executors' commissions as trustees, or to correct an error in including in the appraisement property erroneously supposed to have passed to a son of the decedent."

In Estate of Campbell, 50 Misc. Rep. 485, 100 N. Y. Supp. 637, the court held that an order of the surrogate court, fixing the amount of inheritance tax due from an estate, may subsequently be modified, by allowing for a debt which was originally overlooked. In the case of Morgan v. Cowie, 49 App. Div. 612, 63 N. Y. S. 608, 610, the court considered a clause like that contained in Sec. 24, Ch. 126, Sess. L. 1921, to the effect that the District Court may cause an appraisement to be made "as often and when occasion requires." The court said:

"The power is given to the surrogate to appoint an appraiser 'as often as and whenever occasion may require.' (Laws of 1892, Chap. 399, § 11.) If property, through collusion or inadvertently, has escaped assessment, the court is not without a remedy to reach it, although the time for appeal, within the language of the act, has expired. If

facts have arisen since the imposition and payment of the tax, showing it was improperly assessed or excessive in amount, or without the jurisdiction of the court to tax, then the court possesses the power to redress the wrong done. (Jessup Surr. Pr. 103; Matter of Henderson, 157 N. Y. 423, 52 N. E. 183; Matter of Flynn, 136 N. Y. 287, 32 N. E. 767; Matter of Coogan, 27 Misc. Rep. 563, 59 N. Y. S. 111; Ladd v. Stevenson, 112 N. Y. 325, 19 N. E. 842, 8 Am. St. Rep. 748; Matter of Fulton, 30 Misc. Rep. 70, 62 N. Y. S. 995.)''

In Estate of Silliman, 79 App. Div. 98, 80 N. Y. S. 336, 338, affirmed in 175 N. Y. 513, 67 N. E. 1090, the order of the surrogate court was sought to be modified by reason of additional executors' fees that had subsequently accrued. It was held that the order was properly modified because of want of jurisdiction in the original assessment, the court saying:

"It would seem, therefore, that the previous assessment of the tax so far as it included such commissions was without jurisdiction, and that the surrogate's court possessed power to modify its prior decree so as to exclude such commission from consideration as any part of the sum upon which the tax was to be assessed.''

See also Matter of Townsend, 153 App. Div. 85, 138 N. Y. S. 191, where a number of New York decisions are reviewed.

These cases may not be applicable under the laws of this state. But the attorney general was confronted with them at the time that he made the settlement of 1928, and, in the absence of an authoritative interpretation of the law by this court, might well cause him to doubt what the law actually was, and to what extent he might be able to enforce the judgment of 1923. We think accordingly that he had the power to make a compromise and settlement of the action of 1928, with the approval of the inheritance tax commissioner, and that this settlement was a legal basis for a binding judgment of the court pursuant thereto. The

judgment of the District Court in this action must accordingly be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.