CHEZ, Atty. Gen., v. INDUSTRIAL COMMISSION
OF UTAH et al.

No. 5731.   Decided December 1, 1936.   (62 P. [2d] 549.)

*S. D. Huffaker,* of Salt Lake City, for plaintiff.

*Grover A. Giles* and *F. A. Trottier,* both of Salt Lake City, for defendants.

WOLFE, Justice.

This is an application to prohibit the Industrial Commission from accepting from the town of Scipio the sum of $7,200 in consideration of the surrender and cancellation of seven of said town's $1,000 bonds together with matured interest of $517.40. One bond, due June 1, 1934, and another due June 1, 1935, are in default. The other five bonds had not matured when this writ was sued out. The petition alleges that the present value of all the bonds is $7,200. The action is really to procure an interpretation of section 27, art. 6, of our State Constitution, which reads as follows:

"The Legislature shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the State, or to any municipal corporation therein."

It was rather presumed that the decision in this case would be of guidance to all officers, boards, departments, and commissions as to their right to compromise or take less than the amount owing on or amount paid for bonds held by such officer, board, department, and commission. As will be seen by what is set out hereunder, this decision rests on its special facts and can form no such general rule of guidance.

We do not believe section 27, art. 6, applies to the facts of this case, because an indebtedness to the "State Insur-

ance Fund" is not an indebtedness to the state or any municipality thereof as meant by said section 27. It must be kept in mind throughout the ensuing discussion that the question is not whether the State Insurance Fund is a "public fund" in the sense that it is publicly administered, but whether a debt or obligation owing to it is an obligation or liability to the state as meant by section 27, art. 6. We shall examine the nature of the State Insurance Fund and see what it really is. Section 42-2-1, R. S. 1933, reenacting the original section contained in the 1917 laws, sets up the State Insurance Fund. It states:

"There shall be maintained a fund * * * for the purpose of *insuring employers against liability for the compensation, and of assuring to the persons entitled thereto the compensation, provided by this title*. Such fund shall consist [1] of all *premiums* and *penalties received* and *paid into* the fund, [2] of property and securities acquired by and through the use of moneys belonging to the fund, and [3] of interest earned upon money belonging to the fund and deposited or invested as herein provided." (Italics supplied.)

It will be noted that the basic source of the fund is the premiums and penalties—nothing else. Originally the state contributed $40,000 to start the fund, but this was to initiate it, and as a contribution towards its establishment—a benevolence. True, if the state has not been paid back on liquidation it would probably have a claim for its advancement. But such advancement in no wise changed the nature of the fund, i. e., one derived from premiums and penalties *payable by employers*. And what is it expended for? It is paid *on account of the employer* for compensation *for which he is primarily* liable. See *American Fuel Co. of Utah* v. *Industrial Comm.*, 55 Utah 483, 187 P. 633, 8 A. L. R. 1342. The employer really pools his premiums in the State Fund to create a fund for the payment of an obligation for which it is liable. It is a common fund belonging to the participating employers. It is therefore not derived from anything owing to the state nor paid out on behalf of any state obligation. The coming into the fund is voluntary. If employ-

ers band together and form their own fund with a management selected by them, which fund would pay their compensation liability, there would be no question as to the nature of the fund. It would not then even be public moneys in the sense that it was in custody of and managed by a public body or held by a public official. Change the situation somewhat. The Legislature provides for workmen's compensation, a social and a public purpose. The end it desired to accomplish was to see that workmen incapacitated by industrial accidents or their dependents in case of an industrial death were paid something to live on. Not so much to accomplish this end as to assure its accomplishment, the Legislature required the compensation risk to be insured. It provided in cases of financially able employers for self-insurance. Those not obtaining the privilege of self-insurance could either insure in a private carrier or in a fund which the Legislature provided for, consisting of employers' contributions or premiums. Forty thousand dollars was given to start it off, and premiums are paid into it by the state for its own employees like any private employer. But basically it is no different than if the state and a number of private employers agreed to establish their own fund. It was made easier by setting up a skeleton fund to begin with, giving the Industrial Commission the administration of it and providing by law for rules and regulations to govern it. That reached more quickly and more easily the same result as a mutual company would have reached. It served to give employers, who were forced to insure, a means to get the insurance practically for the cost of the compensation without charges for profits or acquisition and in addition gave it a public aspect and made its administration and management subject to public audit, inspection, and responsibility. But it did not change the essential nature of the venture. It was a venture by the state as an employer and certain private employers who choose to come in, in which they pooled their premiums to create a fund for the purpose of paying, not a state obligation or

making expenditures on behalf of the state, but of paying their own contingent compensation liabilities. Any indebtedness or obligation to such a fund, whether for premium payments, or principal or interest on securities invested in, is not an indebtedness or obligation or liability to the state as meant by section 27, art. 6, of our Constitution. Should the state at some time establish a means whereby counties, cities, school districts, etc., could pay bond premiums into a fund and obtain faithful performance bonds from the body required by law to administer the fund, the state itself bonding its officers therein, and should make any profits payable to those contributing to the fund and should start it off by an advancement of $40,000, it would not be contended that such fund operated by the state purely for the benefit of the participants made an indebtedness to the fund an indebtedness to the state.

This theory is amply borne out by other sections of the Code. The cost of the audit is paid out of the fund, not by the state or out of an appropriation. Section 42-2-2. "There shall be no liability on the part of the state beyond the amount of such fund." Section 42-2-1. Thus, the state in effect says: "We will create, establish, manage, collect and administer through the Industrial Commission but as an agent and trustee only for the contributing employers." The commission may reinsure risks. Section 42-2-9. By section 42-2-10, subsecs. (3) and (4), balances earned and not needed as reserves are turned where? Not to the state, but back to the contributing employers. If the Legislature decided to discontinue the State Fund, upon liquidation anything not needed to pay contingencies would be returned to the contributing employers. The fund is publicly administered, but its debtors are not debtors to the state. It belongs, not to the state, but to the contributing employers for their mutual benefit. It constitutes a pooling of risks under the auspices of the state. See 71 C. J. 900, § 628; State ex rel. *Stearns* v. *Olson,* 43 N. D. 619, 175 N. W. 714; *State* v. *Padgett,* 54 N. D. 211, 209 N. W. 388; *Industrial*

*Commission of Colorado* v. *Stong,* 77 Colo. 590, 239 P. 12. Section 3096, Comp. Laws Utah 1917, provided that the commission was vested with *full authority* over said fund, and may do *all* things necessary or convenient in the administration thereof, or in connection with the *insurance business* to be carried on by it under the provisions of that title. This section recognized it as an "insurance business." It is an insurance business for the benefit and accommodation of the contributing employers. It provides a means for meeting an obligation placed on them by the Legislature which at the same time is useful in holding down the charges of the private stock companies. The Legislature gave the commission "full authority" over the fund.

Owing to the fact that we have concluded that the State Insurance Fund, while a public fund in the sense of being administered by a public body, is not public money in the sense that it is money of the state to be used for and on behalf of the state for a state expenditure, and therefore money owing to it is not an obligation to the state as meant by section 27, art. 6, of the Constitution, it is unnecessary for us in this opinion to discuss or decide the question of whether section 27, art. 6, is a prohibition only against the Legislature as such or whether it extends to administrative or executive bodies or commissions created by the Legislature. Nor is it necessary for us to decide whether debts owing to the State Land Board, or other departments, commissions, or boards, may be compromised by such bodies. Cases involving the right to compromise by such bodies will have to be decided on their facts when and as they arise.

We have decided the question presented in this case without determining whether there was not by injunction a speedy and adequate remedy at law. Having now decided the legal question presented, we are compelled nevertheless to make the writ permanent because the Industrial Commission is without authority to sell the bonds without the approval of the Board of Examiners.

The Chief Justice has called our attention to section 42-2-14, R. S. 1933, reading as follows:

"The commission may invest any of the surplus or reserve belonging to the state insurance fund in bonds of the United States or federal land banks, of this state, or of any county, city, town or school district of this state, at current market prices for such bonds; or in first mortgages on real estate at not to exceed forty per cent of the cash value thereof; provided, that such purchase or investment is authorized by a resolution adopted by the commission and approved by the state board of examiners. * * * The state treasurer shall honor and pay all vouchers drawn on the state insurance fund for the purchase of such bonds when signed by any two members of the commission upon delivery of said bonds to him when there is attached to such voucher a certified copy of such approved resolution of the commission authorizing the purchase of such bonds; and the commission may sell any of such bonds upon like resolution, and the proceeds thereof shall be paid by the purchaser to the state treasurer."

The words "like resolution," in the last three lines of this section, we think, refer to "approved resolution."

Since it does not appear that the Industrial Commission has obtained the approval of the Board of Examiners to the proposed sale, the writ must be made permanent. Such is the order.

ELIAS HANSEN, C. J., and FOLLAND, J., concur.

MOFFAT, Justice (dissenting).

I dissent. The petition alleges that petitioner is the Attorney General of the State of Utah, a property owner and taxpayer of the state. That the Industrial Commission is a body corporate of the state and the individual defendants are the duly appointed, qualified, and acting members of the Industrial Commission of Utah. That the town of Scipio is a municipal corporation of the state of Utah, organized and existing by virtue of the laws thereof. That about June, 1925, the town of Scipio issued and sold, and the State Insurance Fund by and through the Industrial Commission purchased, seven $1,000 bonds, which bonds were general

obligations of the town and the full faith and credit and all taxable property within the town limits were pledged for the punctual payment of the principal and interest thereof.

That one of said bonds so purchased became due and payable June 1, 1934, another June 1, 1935, and one each year thereafter until June 1, 1940. A copy of one of the bonds is made a part of the petition. The defendants purchased the said seven bonds for and on behalf of the State Insurance Fund. The purchase price thereof was paid out of and belonged to said fund. The bonds were deposited with the State Treasurer, and ever since their purchase have been and now are in his custody and under the administration and in the control of the defendants as provided by law. The bonds maturing June 1, 1934, and June 1, 1935, have not been paid. There is accrued interest due and unpaid in the sum of $517.40.

It is then alleged that the town of Scipio is offering to the defendants, the Industrial Commission and the members thereof in their official capacity, the sum of $7,200 for the cancellation of an obligation of $7,717.40, and in consideration of the offered payment requests the surrender, cancellation, and release of all claim and obligation on the said bonds held as aforesaid against the town of Scipio. It is also alleged that the present market value of the said bonds including the interest, is the sum of $7,200, the amount alleged to be offered for the surrender and relinquishment thereof. It is further alleged that the defendants have threatened to and will accept the offer of payment of $7,200 and will surrender and return to the town of Scipio the said bonds, and will release it from all obligations arising by virtue of the bonds, unless prohibited by order of this court, and that the defendants will ask and receive the consent of any other state officers or departments whose consent may be thought necessary to bring about a surrender, release, and cancellation of said bonds. Plaintiff makes the usual allegation that he has no plain, speedy, and adequate remedy in the ordinary course of law, and prays for the writ aforesaid restraining

and prohibiting defendants and each of them from relinquishing, canceling, or returning the said bonds to the town of Scipio for any sum less than the principal thereof with the full amount of the accrued interest thereon, and for general relief.

There are not many cases bearing directly upon the question as submitted in the briefs and arguments presented to the court. The briefs and arguments stress the twenty-seventh section of article 6 of the Constitution of Utah. Before quoting the section or discussing the matter, we desire to say there is involved, in the view we take of the case, more than the construction and applicability of the section of the Constitution referred to. Section 27 of article 6 reads:

"The Legislature shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or person to the State, or to any municipal corporation therein."

Does a bond purchased with the surplus or reserve funds of the "State Insurance Fund" bring into existence an indebtedness, liability, or obligation to the state? We think it does. It is to be observed that the questions under consideration relate to an indebtedness, liability, or obligation upon an investment in and disposition of bonds only. Under the provisions of the statute, "The commission may invest any of the surplus or reserve belonging to the state insurance fund in bonds of the United States or federal land banks [bonds], of this state, or of any county, city, town or school district of this state, at current market prices for such bonds." R. S. Utah 1933, 42-2-14. Under the provisions of section 42-2-3, R. S. 1933, "The commission shall administer the state insurance fund * * * agreeably to the provisions of this title."

It has been held that the State Insurance Fund has no corporate existence. It has no power to claim or assert an indebtedness or an obligation to it as such. The question of the status of the State Insurance Fund was set forth in the

case of *Ban & Kariya Co.* v. *Industrial Commission of Utah,* 67 Utah 301, 247 P. 490, 492. It is there said:

"We have endeavored to point out that the Legislature has in no way attempted to make, nor has it made, the state insurance fund an independent entity disassociated from the Industrial Commission. The fund is not given any of the powers usually provided or deemed necessary for the functioning of a body corporate. In other words, the state insurance fund as a legal entity has no existence."

There is a very good reason for the Supreme Court to so hold, as will appear from a later reference to the State Constitution relating to the matter.

The State Insurance Fund, as such, may neither contract nor be contracted with. It may not incur an indebtedness nor obligation nor claim the right to collect if such were claimed. The Scipio bonds proposed to be surrendered or canceled are not an obligation, indebtedness, or liability to the State Insurance Fund, though required to be deposited therein when purchased and received. The Scipio bonds, or any other bond or obligation, indebtedness, or liability arising out of the investment by the Industrial Commission, do not create an indebtedness, liability, or obligation to the Industrial Commission, as such, or to the members thereof, individually or collectively. To argue so would be equivalent to arguing that school funds invested by the State Land Board in bonds or other obligations become obligations due to the Land Board, or the members thereof. Because the State Treasurer is the custodian of the State Insurance Fund and is required to collect the principal and interest on the bonds and deposit such collections in the fund does not make the obligation or the fund run to the State Treasurer. Section 42-2-14, R. S. 1933, provides:

"All such securities so purchased shall be placed forthwith in the hands of the state treasurer, who is hereby designated as custodian thereof, and it shall be his duty to collect the interest thereon as the same becomes due and payable, and also the principal thereof, and to place the same when collected to the credit of the state insurance fund."

That the "State Insurance Fund" is a public fund, a fund the state by its agencies is administering for the state and belongs to the state, without indulging in refinements as to the nature of ownership, seems beyond question. Public funds are "moneys belonging to a government, or any department of it, in the hands of a public official." Webster's New Int. Dict., 1005. "After the premiums are paid into the fund by the employer under the act, *the fund becomes the property of the state,* and is held in trust for the payment of compensation to such injured employees as the state may designate." (Italics added.) *State ex rel. Williams* v. *Industrial Commission of Ohio,* 116 Ohio St. 45, 156 N. E. 101, 103. The State Insurance Fund being a public fund, as distinguished from private funds, the bonds in question being a part of that fund, the obligation to pay such bonds as long as they remain a part of that fund is an obligation, indebtedness, or liability to the state, to be held, collected, or recovered by the properly designated state agencies.

No statute or authority is cited giving the Industrial Commission or any other state agency or officer authority or power to release or extinguish, in whole or in part, the indebtedness, liability, or obligation to the state, and such power being denied the Legislature, it follows that the Industrial Commission may not do what it is not authorized to do, nor what the Legislature may neither do nor authorize to be done.

Section 1, art. 12, of the State Constitution provides:

"Corporations may be formed under general laws, but shall not be created by special acts. All laws relating to corporations may be altered, amended or repealed by the Legislature, and all corporations doing business in this State, may, as to such business, be regulated, limited or restrained by law."

The State Insurance Fund, under the limitations imposed by the above provision, could not, by the Legislature, be created or made a private corporation. Nor could the Legislature make the Industrial Commission a private corporation. Both the State Insurance Fund and the State Industrial

Commission were created by special acts of the Legislature, and whatever status either of them may occupy in the administrative economy of the state, it must be that of an arm of the state and function as such. Neither the Industrial Commission or the State Insurance Fund can be a municipal corporation. Section 5, art. 11, of our Constitution provides, among other things, that, "Corporations for municipal purposes shall not be created by special laws." The Industrial Commission, therefore, could not, under the special law creating it, obtain the status of a municipal corporation. The same is likewise true of the State Insurance Fund. May the State Legislature by special act create a state agency to do private business, or develop two state agencies into a private business for the purpose of carrying on an industrial insurance business, or set up a municipal agency to accomplish the same purpose? The provisions of the Constitution forbid. State agencies are for the purpose of doing state business. If the Legislature may create some floating entity without ancestry, set it going as an orphan institution under the administration of a state-created board, agency, commission, or what not, acting for and on behalf of the state, and that agency may do things under a legislative enactment which the Legislature is prohibited from enacting under the limitations of the Constitution, the constitutional limitations or prohibitions or mandates become easy of evasion and their existence a mere matter of words to be ignored or disregarded whenever the desire to accomplish a given purpose may suggest a convenient procedure.

The State Insurance Fund is a special trust fund, appropriated by the Legislature and built up by a direct appropriation of State Funds, with a provision for repayment, with further provisions relative to the amount required to be accumulated by the payment of premiums into that fund, the consideration for which is insurance for employees of employers so paying. The administration thereof as provided by law does not remove the fund from the effect of the con-

stitutional limitation safeguarding that fund from depletion in the manner specified.

Words and phrases are difficult of exact definition. When we use the phrase "public fund," we convert the word "public," originally and commonly used as a noun, into an adjective. It is a convertible term, difficult if not impossible of definition and used variously, depending upon the subjects to which it is applied. See 50 C. J. 44. The word "fund" is. likewise a word with a variety of meanings. Constructions differ, and the classification of a fund must depend upon and be gathered from the context.

The Supreme Court of North Dakota, in the case of *Tandsetter* v. *Oscarson*, 56 N. D. 392, 217 N. W. 660, referred to the Workmen's Compensation Fund as a public fund. Chief Justice Budge, speaking for the Idaho Supreme Court in the case of *Parsons* v. *Diefendorf*, 53 Idaho 219, 23 P. (2d) 236, 239, in discussing the proposed sale of certain securities purchased with school funds (while neither the. constitutional provision nor the statute is identical with ours, the situation is sufficiently analogous to be of inter-- est), says:

"The trust created by the Constitution and laws of this state is a fixed trust, in no sense a speculative trust or a trust that can be used for speculative purposes, however, advantageous a change in investments may appear."

Under the Utah statute, the Industrial Commission is authorized to sell the bonds and mortgages referred to in the section, yet the fund is in no sense a speculative fund. The type of securities in which the surplus and reserve may be invested clearly indicates its character. The law requires the investment of the surplus and reserve of the State Insurance Fund in such securities as will preclude all reasonable possibility of loss or depletion by release, cancellation, or sale so long as the ordinary processes of government are operating and maintained. This surplus fund investment is designed as a security, not to be released except upon payment in full of the obligation in which the fund is invested..

The last clause of section 42-2-14, R. S. 1933, provides:

"The commission may sell any of such bonds upon like resolution, and the proceeds thereof shall be paid by the purchaser to the state treasurer."

Defendants cite and rely upon *Burr* v. *City of Carbondale*, 76 Ill. 455. In that case the question was only indirectly involved. Certain bonds had been issued for the construction of certain school and other buildings. The state later took over the project and became possessed of bonds formerly issued. The Legislature had authorized the issuance of a smaller amount of bonds and the cancellation of the larger and former issue of bonds upon sale of the subsequent bonds and payment of an amount considerably less than the amount of bonds held by the Governor. Numerous questions were presented including the validity of both the original and refunding issue of the bonds. The section of the Illinois Constitution (art. 4, § 23) is practically the same as section 27, art. 6, of our Constitution. Without argument or discussion and by a divided court the Illinois court on this point said:

"But they contend, if the original issue was legal, then they insist that the resolution of the General Assembly of 1871, authorizing the Governor to sell them to the city issuing them, is an infraction of section 23, of article 4, of the present constitution. That section is as follows: 'The General Assembly shall have no power to release or extinguish, in whole or in part, the indebtedness, liability or obligation of any corporation or individual to this State.'

"We can not suppose this provision was designed to embrace a case like this. If it does, then the original issue being held valid, those bonds are still binding upon the city, and they must pay them. But we do not think this section of article 4 was intended to embrace a release of claims *doubtful or hazardous*, which the State might hold against a municipal or other corporation or individual. On the face of those bonds the State was not named as the obligee. They do not purport to be an undertaking in which the State is a party. They had become the property of the State, which the Governor, under the resolution, was authorized to sell to the obligors for less than one-third of their nominal value." (Italics ours.)

The case of *Burr* v. *Carbondale,* supra, was briefly referred to and commented upon in the case of *State ex rel. Wilson* v. *Young,* 44 Wyo. 6, 7 P. (2d) 216, 221, to the effect that:

"That decision goes too far, perhaps, and we are not at this time prepared to follow it to its full extent, but it indicates, nevertheless, the rule that should be applied in this case."

In addition to what was said by the Wyoming court as to the Illinois case going too far, it appears to us that the basis upon which the case is put as to whether or not the constitutional provision is applicable is untenable.

When a claim is *"doubtful or hazardous"* and realization thereof becomes a matter for judicial determination, a different situation is presented than canceling an obligation by an administrative body, no matter how honest the intention or capable the personnel of such agency. If the power were to be left to the Legislature or any administrative agency set up by it to determine whether a claim, indebtedness, or obligation were *"doubtful or hazardous"* and releases made upon such determination as a purely administrative matter, aside from any question of good or bad faith, no standard or measure of determining such question could be made controlling. The Constitution was intended to prevent preferential negotiations from being made.

The statute makes it the duty of the State Treasurer to collect. If a contest or question of value, *hazard, or doubtful recovery* is presented when the matter gets before the courts, the question then ceases to be one of release from indebtedness or liability. It becomes one of what may reasonably be recovered, as disclosed by the evidence. Bankruptcy, corporate dissolution, ability to realize upon taxes properly levied, catastrophies, droughts, or other factors may, when the question is submitted to the courts, be properly there for consideration. The constitutional inhibition runs against the Legislature, not the courts.

Under the authority to sell bonds upon proper resolution of the Industrial Commission, as is authorized by section

42-2-14, R. S. 1933, such sale must be one in good faith to a good-faith purchaser, and must not be for less than market value. No facts are alleged from which a market value may be inferred or determined. It is not alleged that the bonds had been offered for sale either publicly or privately. There are no allegations indicating any necessity for a sale. Nor is there any showing that the obligor on the bonds is not able to pay according to the contract contained in the bonds themselves. By the contract obligation of the bonds, the "full faith and credit and all taxable property within the town of Scipio * * * are and shall continue to be pledged to the punctual payment of the principal and interest" of the bonds here proposed to be canceled for less than there is due thereon. From the offer made, Scipio must be solvent. Under such a showing, notwithstanding the allegation and, by demurrer, the admission, it would amount to a legal fraud upon the state and the State Insurance Fund to permit a cancellation of the bonds for less than the amount due and the State Insurance Fund would be depleted to the extent of the difference without any consideration therefor, and if it should be shown that full payment could be made, cancellation for less would be a fraud upon the state, and a dereliction of duty for which officers should be personally responsible. Aside from any constitutional inhibition, it would be legal fraud to sell the bonds for less than the amount due thereon, until a showing should be made indicating a reasonable necessity therefor, and a legal order obtained therefor. No showing is made that the Insurance Fund must have the cash to carry on, nor is it intimated that the town of Scipio is unable to pay in full. An excellent credit standing is indicated from the allegation that Scipio is offering to pay the major part of the bonds before maturity. No doubt the upstanding citizenry of Scipio would resent an imputation that its credit was not good, that the faith pledged when the bonds were issued had been blighted and should now be held for naught, that the town was bankrupt, or that by the

ordinary processes of taxation the necessary funds could not be raised to meet the bonds in question.

The statute makes it the duty of the State Treasurer to collect the interest on the bonds in which the surplus and reserve of the Insurance Fund may be invested as the same becomes due and also the principal. R. S. Utah 1933, § 42-2-14. It is alleged that two of the bonds are past due and that there is unpaid interest. No suggestion is made as to why the Industrial Commission, in pursuance of its duty, has not called upon the State Treasurer to do his duty in this regard as required by the statute nor why he should not be requested to do so before the commission proposes to accept less than is due, upon an apparently sound obligation, and thus bring discredit to a good-faith obligation involving the integrity of a municipality of the state without exhausting the remedy provided by law.

It does not appear that a demand has been made by the treasurer or any one else for payment of a just and apparently sound obligation, worth all that is due thereon. Should demand be made for payment and refused for any reason, then it would be the duty of the State Treasurer to discharge the duty imposed upon him and proceed by law to enforce payment. It would be time enough to consider compromise, if compromise were proposed, when a showing had been made in court that a state of bankruptcy existed or that the obligation was hazardous or doubtful or recovery in full could not be had. The question would then be one for the court upon the issues and the evidence to determine, not that the liability, indebtedness, or obligation should be released in whole or in part, but on the contested or conceded issues, how much or what could be recovered as shown by the evidence or as to what could be realized upon a judgment. If the authority vested and power conferred to levy taxes upon the property may not result in raising funds to pay the obligation in full, a state of bankruptcy may be found to exist and the treasurer would no

doubt be compelled to be content with such recovery as was possible.

Such procedure is the intent of the statute. The surplus and reserve of the State Insurance Fund may be invested only in bonds of the United States or federal land banks, or bonds of this state, or bonds of any county, city, town, or school district, or first mortgages on real estate at not to exceed 40 per cent. of the cash value thereof. It may be observed that the bond investments are limited to those issued by the United States, the state, or municipal arms of the state endowed with a general taxing power equal to that provided for the support of government itself.

No want of good faith on the part of the Industrial Commission, the State Treasurer, or other state agency is alleged or imputed, and nothing indicating such want of good faith is suggested nor remotely imputed from what is said in this opinion.

The question of the market value is not an issue. The amount for which the proposed cancellation is to be made is said to be the market value. This is a conclusion. The law has provided for the investment of the funds in securities of such character as to eliminate questions of market value and such as to remove any necessity for a cancellation, release, or extinguishment of the debt, in whole or in part. The indebtedness, liability, or obligation evidenced by the bonds proposed to be released and cancelled for less than the contract obligation would seem to require no sacrifice.

In the case of *Industrial Commission* v. *Stong*, 77 Colo. 590, 239 P. 12, 14, the State Treasurer was directed by the Industrial Commission to invest certain of the state compensation insurance funds, of which he was custodian, in government bonds. The treasurer disregarded the direction given him and otherwise invested the fund until a loss was suffered when he complied. Suit in mandamus and for damages was instituted. The court said:

"Plaintiff and Stong were in effect, if not technically, trustees of a public trust. They were obliged to invest this insurance fund as pro-

vided by law and in that way obtain an income from it for the benefit of dependents under the Workmen's Compensation Act. That duty they could not neglect without responsibility, nor could they distribute gratis the fund thus intrusted to their care. * * * Certainly the commission could no more consent that he fail in that duty than it could consent that he appropriate the fund to his own use."

In principle, the commission can no more consent to cancellation or release of the obligation or indebtedness due from the investment of the insurance fund in the Scipio bonds than it could consent to appropriate the difference in amount due and the amount proposed to be paid to the construction of a monument to an honored citizen, who in his heart might say, "The humble shall see this and be glad."

It is more important to maintain the honesty and commercial integrity of people, cities, towns, and the state than to consider small losses or gains. "To do justice and judgment is more acceptable to the Lord than Sacrifice." Prov. 21:2, 3. "He that oppresseth the poor to increase his riches, and he that giveth to the rich, shall surely come to want." Prov. 22:16. If the State Treasurer should find, in the orderly process of collection, that the obligor has nothing or not enough with which to pay and such showing be made, let justice be done.

The peremptory writ of prohibition heretofore issued should be made permanent.

EPHRAIM HANSON, Justice.

I concur in the views expressed in the dissenting opinion of Mr. Justice MOFFAT.